HARPER LAW, PLC
Jon V. Harper (1378)
Denise Dalton (9610)
68 South Main Street, Suite 800
Salt Lake City, Utah 84101
Tel:  (801) 910-4357
jharper@jonharperlaw.com

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| CHARLES BAKER, derivatively on behalf of LIFEVANTAGE CORPORATION,<br><br>        Plaintiff,<br><br>v.<br><br>DARREN JAY JENSEN, MARK R. JAGGI, MICHAEL A. BEINDORFF, DAVID S. MANOVICH, GARRY M. MAURO, GEORGE E. METZGER, RICHARD OKUMOTO and DAVID TOOLE,<br><br>        Defendants,<br><br>-and-<br><br>LIFEVANTAGE CORPORATION,<br><br>        Nominal Defendant. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>**Case No.:  2:17-cv-00141-PMW**<br><br>**Judge:  Magistrate Judge Paul M. Warner** |

By and through his undersigned counsel, Plaintiff Charles Baker ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant LifeVantage Corporation ("LifeVantage" or the "Company") and against certain current and former officers and directors of the Company for breaches of fiduciary duties, unjust enrichment, and corporate waste. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning himself and, as to all other matters, upon the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by LifeVantage and other related parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the defendants and other related non-parties; (c) review of news articles, shareholder communications, and postings on LifeVantage's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with and publicly available from the related pending securities fraud class action, *Zhang v. LifeVantage Corporation et al.*, Case No. 2:16-cv-00965 (D. Utah) (the "Securities Class Action"); and (e) review of other publicly available information concerning LifeVantage and the Individual Defendants (defined below).  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.  In support of these derivative claims, Plaintiff alleges as follows:

## NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action seeking to remedy wrongdoing and breaches of fiduciary duties committed by officers and directors of LifeVantage between at least September 1, 2015 and the present (the "Relevant Period").  During the Relevant Period, the Individual Defendants breached their fiduciary duties by, among other things, failing to ensure that the Company had adequate internal controls in place and causing the Company to issue false

and misleading statements concerning the Company's financial results, business and operations, including false and misleading statements regarding the costs and expected sales of products in international markets.

2.    Specifically, defendants made or caused LifeVantage to make false and/or misleading statements and/or failed to disclose that: (i) LifeVantage lacked effective internal financial controls; (ii) LifeVantage improperly accounted for sales and revenues in certain international markets; and (iii) as a result of the foregoing, LifeVantage's public statements were materially false and misleading at all relevant times.

3.    On September 13, 2016, LifeVantage announced there would be a delay in the release of the Company's financial results for the fourth quarter and fiscal year of 2016 because LifeVantage was "currently unable to estimate the impact of the review to net revenue, tax expense, net income or other aspects of its financial statements for the fiscal year ended June 30, 2016 or any potential prior periods." The announcement stated LifeVantage was "in the process of reviewing its sales into certain international markets and the revenue and income tax accruals associated with such sales[,]" including "the deductibility of commission and incentive expenses associated with such sales, as well as the policies and procedures related to sales in those specific markets."

4.    The September 13, 2016 press release also stated LifeVantage's Audit Committee was purportedly "conducting an independent review of these matters and has retained independent counsel to assist in that review[,]" and that it would not be in a position to release financial results for the fiscal year ended June 30, 2016 until the review by the Audit Committee was completed.

5.      The September 13, 2016 disclosure followed numerous recent departures of the Company's independent auditors. On April 8, 2016, LifeVantage dismissed EKS&H LLLP ("EKS&H") as the Company's independent registered public accounting firm.  On April 12, 2016, LifeVantage hired BDO USA, LLP ("BDO"), but less than three months later, on July 7, 2016, LifeVantage announced its termination of BDO effective immediately. On  July 11, 2016, LifeVantage retained WSRP, LLC as its new independent auditor.

6.      On September 30, 2016, LifeVantage announced it had received  a letter from NASDAQ stating the Company was  not  in  compliance  with  Listing Rule 5250(c)(1) as a result of the Company's delay in the filing of its fourth quarter and  fiscal year 2016 financial results. This rule requires NASDAQ listed companies to timely file all  required periodic financial reports with the Securities and Exchange Commission.

7.      On December 12, 2016, LifeVantage finally announced the filing of its financial results for the fiscal year ending June 30, 2016.  LifeVantage's Form 10-K admitted that the problems with the Company's distributors in international markets adversely affected the Company's revenues, and would continue to adversely affect revenues in the future.  The 2016 Annual Report stated that:   "In the years ended June 30,  2016 and 2015,  we estimate that approximately $17.3 million and $6.7 million in net revenue, respectively, related to sales of our products to independent distributors who may have carried or shipped such products into countries in which our products are not registered or that otherwise impose stringent restrictions on our direct selling model."  The $17.3 million of sales adversely affected in 2016 constituted approximately 8% of the Company's total sales.

8.      At the time LifeVantage announced its 2016 results and Q1 2017 financial results,

Defendant Mauro stated that the Audit Committee's internal investigation was triggered by an internal complaint from one of the company's employees in the tax department.  Moreover, Mauro stated that after the Audit Committee began its investigation, the Board received a formal complaint by another employee under the Sarbanes-Oxley Act ("SOX").

9.     In announcing the Audit Committee's results of the internal investigation, Defendant Mauro said that the Audit Committee had determined that it had discovered material weaknesses related to internal controls over international sales, contrary to the Defendants' representations in prior SEC filings that the Company did maintain effective internal controls.

10.     In LifeVantage's 2016 Annual Report, it was revealed that the Company's auditor had issued a negative opinion about the Company's internal controls.

11.     On January 18, 2017, three weeks after filing its delayed 2016 Annual Report, LifeVantage announced that it had fired Defendant Mark Jaggi, the Company's CFO.  The announcement surprised the financial markets, especially since LifeVantage gave no reason for its CFO's departure and since Jaggi had been on the job less than a year and a half.  The firing was declared effective "immediately" and LifeVantage fired Jaggi before it had found a full-time replacement CFO.

12.     In response to the disclosure of Jaggi's termination, the price of LifeVantage's stock declined from $7.56 on January 18, 2017 to $7.17 on January 19, 2017.  It continued declining thereafter, reaching a new 52-week low of $6.19 on February 23, 2017.

13.     As a result of the Individual Defendants' conduct, LifeVantage's common stock traded at artificially inflated levels during the Relevant Period.

14.     LifeVantage's Board of Directors (the "Board") has not, and will not,

commence litigation against the Individual Defendants named in this complaint, let alone vigorously prosecute such claims, because they face a substantial likelihood of liability to LifeVantage for authorizing or failing to correct the false and misleading statements alleged herein and for failing to correct and/or implement the necessary internal controls to prevent the harm to the Company that has occurred. Accordingly, a pre-suit demand upon the Board is a useless and futile act. Thus, Plaintiff rightfully brings this action to vindicate LifeVantage's rights against its wayward fiduciaries and hold them responsible for the damages they have caused to LifeVantage.

## JURISDICTION AND VENUE

15. Subject-matter jurisdiction exists under 28 U.S.C. § 1332 because there is complete diversity between Plaintiff and defendants and because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

16. This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

17. Venue is proper in this District under 28 U.S.C. §§ 1391 and 1401 because LifeVantage maintains its principal executive offices in this District and because a substantial portion of the acts and conduct complained of herein —including the dissemination of materially false and misleading information to the investing public — occurred in this District.

18. Each Individual Defendant has minimum contacts with this District, as they have entered into contracts in this District, or have frequently traveled here, on LifeVantage's business, or have authorized acts and actions that have had a sufficient impact in this District or on LifeVantage's shareholders and investors residing here to justify the exercise of jurisdiction

over them.

## THE PARTIES

### A.   Plaintiff

19.    Plaintiff Charles Baker is, and at all relevant times has been, a holder of LifeVantage common stock. Plaintiff purchased shares of LifeVantage stock in 2013 and has continuously held such shares since such time to the present.  Plaintiff is a citizen  of Missouri.

### B.   Nominal Defendant

20.    Nominal Defendant LifeVantage is incorporated in Colorado, and the Company's principal executive offices are located at 9785 South Monroe Street, Suite 300, Sandy, Utah 84070.   The Company's common stock is traded on The NASDAQ Stock Market under the ticker symbol "LFVN."   The Company had more than 14 million shares outstanding as of July 15, 2016.

### C.   Individual Defendants

21.    Defendant Mark R. Jaggi ("Jaggi") was the Chief Financial Officer ("CFO")  of the Company from August 2015 until January 18, 2017, when LifeVantage fired Jaggi.  Jaggi is a defendant in the Securities Class Action.  Jaggi is  a citizen of Utah.

22.    Defendant Darren Jay Jensen ("Jensen") has been the Company's President and Chief Executive Officer ("CEO") since May 2015, and a director since January 2016. Jensen is a defendant in the Securities Class Action. Jensen received $1,152,164 in total compensation from LifeVantage in fiscal 2015 for the year ended June 30, 2015.  LifeVantage's website states that Mr. Jensen "co-founded two thriving multi-level marketing companies" before joining LifeVantage.  Thus, Jensen was well aware of the operations and legal risks endemic to multi-level marketing companies. Jensen is a citizen of Florida.

23.     Defendant Michael A. Beindorff ("Beindorff") has been a director of the Company since January 2012. During the Relevant Period, Beindorff was a member of the Audit Committee and the Nominating and Governance Committee, and the chair of the Strategic Planning Committee. Beindorff received $92,750 in total compensation from LifeVantage in fiscal 2015 for the year ended June 30, 2015.  Beindorff is a citizen of Colorado.

24.     Defendant David S. Manovich ("Manovich") was a director of the Company from January 2012 until mid-February 2017, and was Executive Vice Chairman (the principal executive officer for the  Company) from February 2015 to May 2015.  During the Relevant Period, Manovich was the  chair of the Nominating and Governance Committee and a member of the Compensation  Committee. Manovich received $293,944 in total compensation from LifeVantage in fiscal 2015  for the year ended June 30, 2015. Manovich is a citizen of California.

25.     Defendant Garry M. Mauro ("Mauro") has been the Company's Chairman of the  Board since November 2013, and has been a director of the Company since April 2008. During  the Relevant Period, Mauro was a member of the Audit Committee.  Mauro received $98,750 in total compensation from LifeVantage in fiscal 2015 for the year ended June 30, 2015.  Mauro is  a citizen of Texas.

26.     Defendant George E. Metzger ("Metzger") has been a director of the Company since January 2012. During the Relevant Period, Metzger was the chair of the Compensation Committee and a member of the Nominating and Governance Committee.  Metzger received $92,750 in total compensation from LifeVantage in fiscal 2015 for the year ended June 30, 2015.  Metzger is a citizen of Tennessee.

27.     Defendant Richard Okumoto ("Okumoto") has been a director of the Company since November 2012. During the Relevant Period, Okumoto was the chair of the Audit Committee and a member of the Strategic Planning Committee. Okumoto received $92,750 in total compensation from LifeVantage in fiscal 2015 for the year ended June 30, 2015. Okumoto is a citizen of California.

28.     Defendant Dave Toole ("Toole") has been a director of the Company since January 2016. During the Relevant Period, Toole was a member of the Compensation Committee and the Strategic Planning Committee.  Toole is a citizen of California.

29.     Defendants identified in ¶¶ 21–28 are sometimes referred to herein as the "Individual Defendants."

30.     Defendants identified in ¶¶ 22–28 are sometimes referred to herein as the "Director Defendants."

31.     Defendants Okumoto, Mauro and Beindorff are sometimes referred to herein as the  "Audit Committee Defendants."

## FACTUAL ALLEGATIONS

### A.  The Individual Defendants Fire Numerous Employees and Adopt Aggressive Sales Incentives for the Company's Multi-Level Marketing Distributors in Order to Attempt to Reverse Slowing Growth

32.     LifeVantage is a company that develops and distributes products that claim to promote healthy living, such as dietary supplements and skin care products. The Company sells its products through a network of independent distributors and customers in North America, Asia, and Australia, and also sells its products online.

33.     The Company was incorporated in Colorado in 1988.

-8-

34.     The Company was formerly named Lifeline Therapeutics, Inc., and shareholders approved the name change to LifeVantage Corporation on November 21, 2006.

35.     The Company's flagship product is called Protandim® ("Protandim"), a dietary supplement.  According to the Company's website,

> Protandim is the only supplement clinically proven (in a peer-reviewed, human clinical study) to reduce oxidative stress in humans by an average of 40 percent in 30 days. Protandim is protected by U.S. patents and is the subject of a number of peer-reviewed clinical studies. This patented antioxidant therapy is many times more powerful than red wine, oranges, blueberries, juices or other popular antioxidant supplements. Protandim works by increasing the body's natural antioxidant protection at the cellular level by inducing the protein Nrf2 to trigger cells to produce naturally occurring protective antioxidant enzymes such as superoxide dismutase (SOD), catalase and the enzymes involved in glutathione synthesis and metabolism.

36.     The Company's other products include TrueScience, a skin care product, and Canine Health, a dietary supplement for dogs that reduces cellular stress and is, according to the LifeVantage website, "formulated to preserve your relationship with the dog or dogs you love."

37.     Since 2009, LifeVantage has used a "network marketing" or "direct selling" business model, also known as multi-level marketing ("MLM"). Instead of selling its products in retail stores or employing its own sales personnel, LifeVantage relies on "independent distributors" both to sell its products and to recruit additional distributors.

38.     According to LifeVantage's Form 10-K for the fiscal year ended June 30, 2015 (the "2015 10-K"), an "independent distributor" is "someone who participates in our network marketing business opportunity by purchasing our products at wholesale prices and selling our products to others." Likewise, "active independent distributors" are defined as "independent distributors who have purchased product from us for retail or personal consumption during the prior three months."

39.     According to LifeVantage's 2015 Annual Report, LifeVantage's distributors are compensated as follows:

> An independent distributor creates multiple levels of compensation by selling our products and enrolling new independent distributors who sell our products. These newly enrolled independent distributors form a "downline" for the independent distributor who enrolled them. If downline independent distributors enroll new independent distributors who purchase our products, they create additional levels of compensation and their downline independent distributors remain in the same downline network as the original enrolling independent distributor. We pay commissions only upon the sale of our products. We do not pay commissions for enrolling independent distributors.

40.     LifeVantage's 2015 Annual Report also stated that:

> Our independent distributors earn compensation on their product sales and product sales made by independent distributors within their sales organization, or "downline." Our independent distributors can also earn money by purchasing product from us at our wholesale cost and selling that product to others at the retail cost.

41.     Thus, pursuant to LifeVantage's compensation system which was put in place by the Individual Defendants, distributors are incentivized both (1) to sell products directly through personal relationships and word-of-mouth marketing and (2) to recruit and train their "downline" organization.

42.     LifeVantage's former CEO, Douglas Robinson ("Robinson"), joined the Company as CEO in 2011 and held that position until he abruptly resigned effective February 2, 2015.

43.     In November 2012, Robinson had claimed the shift to an MLM business model "saved (the) company."[1] Indeed, LifeVantage grew rapidly for several years after 2009. However, tensions among the Company's distributors worsened over time, resulting in the

---

[1] Hank Schultz, *LifeVantage's shift to network marketing saved company, CEO says*, Nutraingredients-USA, Nov. 19, 2012, http://www.nutraingredients-usa.com/Manufacturers/ LifeVantage-s-shift-to-network-marketing-saved-company-CEO-says.

termination of numerous distributors and a number of high-profile lawsuits.[2]

44.     By 2014, the Company's growth had leveled off and then began to decline. The table below shows the Company's revenue per fiscal year:

| Fiscal Year | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|
| Revenues (in millions) | $4.14 | $11.48 | $38.92 | $126.18 | $208.18 | $213.97 | $190.34 |

45.     The revenue decline in 2015 was particularly severe in Japan. According to the 2016 10-K, the Company generated $62 million from Japan in FY 2014, but only $42 million in FY 2015 and $36 million in FY 2016.

46.     A former employee who served as Managing Director of LifeVantage's Japan business from June 2014 until June 2016 has alleged that the decline in Japan was due to intense turmoil among the Company's distributors, who had organized into two factions aligned with each of the country's top two distributors. Eventually, both top distributors had to be terminated, along with many of their supporters, which led to sharp decline in sales volume.

47.     In an effort to jump start LifeVantage's slowing growth, the Company's Board of Directors engaged in a wholesale bloodletting of management.   In 2015, nearly all the Company's top management either resigned or were terminated, including the President and Chief Executive Officer, Chief Financial Officer, Chief Sales Officer, Chief Science Officer, and the General Counsel.

48.     On February 2, 2015, the Company issued a press release announcing that the Board and Robinson had "mutually agreed that Mr. Robinson will step down from his role as

---

[2] *See, e.g., LifeVantage Corp. v. Jackson*, No. 2:12-cv-01003-TS (D. Utah Oct. 26, 2012); *LifeVantage v. Domingo*, No. 2:13-cv-01037-JNP (D. Utah Nov. 19, 2013).

President, Chief Executive Officer and Board Member, effective immediately" and that a search committee had been formed to find a replacement. Meanwhile, the Board had appointed Dave S. Manovich as Executive Vice Chairman and formed an "interim Office of the President" composed of "the Company's senior operational officers: Shawn Talbott. Ph.D, Chief Science Officer, David Phelps, Chief Sales Officer, David Colbert, Chief Financial Officer, and Robert Urban, Chief Operating Officer."

49.     On February 4, 2015, Defendant Garry Mauro, Chairman of the Board, explained in a conference call why the Board replaced the CEO:

> The Board believes this change in our management is necessary as our ***growth has reached a plateau***. The Company is not progressing in line with our business model of a growth-oriented, science-based network marketing company. The intent of this move is to one, deliver consistent, predictable growth; two, to better ensure the success of our outstanding distributor sales force; three, successfully manage the complexities of international product distribution and finance; four, further the validation of our science-based products and finally, address the needs of our customers.

50.     On April 29, 2015, the Company announced in a press release and Form 8-K that Darren Jensen had been named President and Chief Executive Officer, effective May 18, 2015.

51.     On May 5, 2015, the Company announced in a Form 8-K that it had "determined to eliminate the position of General Counsel" and that "the employment of Robert H. Cutler, our General Counsel and corporate Secretary was terminated effective May 8, 2015."

52.     On July 2, 2015, the Company announced in a Form 8-K that it had "terminated the employment of David Colbert, our Chief Financial Officer and Treasurer." On August 24, 2015, it announced that Defendant Jaggi had been appointed Chief Financial Officer and Treasurer.

53.     On July 22, 2015, LifeVantage announced in a press release that it had appointed

Justin Rose as Chief Science Officer.

54.     In November 2015, LifeVantage appointed Ryan Goodwin as Chief Marketing Officer.

55.     The Company also fired its auditor. On April 13, 2016, LifeVantage issued a press release, announcing that "the Audit Committee of its Board of Directors has engaged BDO USA, LLP as its new independent auditor, effective April 12, 2016." But then on July 13, 2016, LifeVantage issued a press release announcing that the Audit Committee of the Board of Directors had "dismissed BDO USA, LLP as the Company's auditor due to BDO's determination that it was not independent of the Company with respect to the  fiscal year ended June 30, 2016" and that WSRP, LLC had been engaged as the Company's new independent auditor.

56.     As LifeVantage's 2016 Annual Report later acknowledged, this turnover was likely "a contributing factor to the material weakness in our internal control over financial reporting  related to our business policies, practices, monitoring and training governing our international business operations."

57.     In the months following Robinson's resignation, there was almost complete turnover of the Company's executive management, and most of the executive officers either resigned or were terminated, including:

> (a)     Robert Cutler, former General Counsel and Corporate Secretary, was terminated  on May 8, 2015 and the Company eliminated the General Counsel position;

> (b)     Shawn M. Talbott, former Chief Science Officer, resigned on July 1,

2015;[3]

(c)     David Colbert, former CFO and Treasurer, was terminated on July 3, 2015; and

(d)     David N. Phelps, former Chief Sales Officer, was terminated on July 16, 2015.

58.     On August 24, 2015, the Company announced in a Form 8-K f i l e d  with the SEC that Jaggi had been appointed CFO, effective immediately.  According to the statement, in connection with his employment, the Company and Jaggi entered  into  an offer  letter  and a Key  Executive  Benefit  Package. Pursuant to the  offer  letter, the  Company agreed to pay Jaggi an annual base salary of $325,000, and granted him 120,000 shares  of restricted stock with additional stock awards in future years, and Jaggi is eligible to participate  in the Company's annual incentive plan at the officer level with a target bonus of 50% of his base  salary.

### The Board Implements a Turnaround Plan Premised Upon Aggressive Sales Incentives, Which Flourished in the Absence of Internal Controls

59.     In an effort to reverse the Company's slowing growth, the Board adopted and implemented an "eight-point plan," which Defendant Jensen  explained in a conference call on September 1, 2015.

60.     The second point in the eight-point plan called for "enhancements to our business model designed  to modify the purchasing habits of our existing distributor base." This included "simplifying  our  enrollment  options  and  the  process  by  which  new  distributors  enter  the

---

[3] A post on Mr. Talbott's blog suggests that his "resignation" was involuntary, stating: "Many people have asked why I left LifeVantage after only about 18 months? The company has instructed me to not talk about the details of my 'resignation' or the fact that my office was already cleaned out when I returned from speaking at a scientific conference in the Philippines. Suffice to say that I (obviously) had a difference of opinion about certain things with the new CEO  and  the  Board  of  Directors."  (https://bestfutureyou.com/2015/07/13/my-new-gig/) (last visited Feb. 24, 2017).

business" as well as creating "additional incentives which created compelling business reasons to join with our most advantageous package." Jensen's rationale was that, in his experience, "distributors who make a greater commitment at the time of enrollment tend to stay with the company longer and are overall more engaged with building their businesses."

61.     The third point in the eight-point plan called for LifeVantage "to incentivize our distributors to achieve higher monthly sales production" by creating a "new bonus pool" for "distributors who join with our largest enrollment package and then sell approximately $5,000 per month of product."

62.     The fourth point called for LifeVantage employees to incentivize and encourage "both new and existing distributors to shorten the time it takes for them to build large sales organizations and advance to our key leadership ranks." This would "create[] a sense of urgency for people to accelerate their rank advancement" while creating a particularly "significant incentive for our new distributors to achieve the important rank of Pro 5," which "serves as the basic building block of leadership in our compensation plan."

63.     The seventh point called for LifeVantage employees "to implement programs and strategies to attract new leaders to our distributor team." In particular, the Company had rolled out a program called "the Red Carpet Experience" to recruit "distributor leader[s]" with "proven track record[s]" from other direct selling companies. Jensen "anticipate[d] that as time progresses, this will be a major factor in attracting strong field leadership to our Company."

64.     Jensen emphasized the seventh point even more heavily on the November 4, 2015 call, when he touted the success of the Company's red carpet events and described his efforts to attract new leaders as central to the Company's strategy for improving its prospects in Japan:

[T]he *key part of the growth in any market and including Japan is field leadership*. Basically, what I found over the last 26 years is that *one leader…can change the course of the country*. And we have many good leaders that are there in Japan, and we're working with them to re-engage them and to energize them in building their business because we have great leadership already. And many of the programs that I just announced, like the red carpet program, the Pro5 accelerator, the platinum packages, those are *all designed to make us more attractive to leadership outside of the company to bring them in because we always need more leadership*. And the better and the more field leadership that we have the faster will get a turnaround in that country.

65.     The eighth point called for LifeVantage to expand globally by "*targeting certain gateway markets* which in turn opens up opportunities in more and more markets in any given region."

### The Company's New Incentives Encourage Improper Sales Practices

66.     The turnaround plan approved by the Board created perverse incentives for the Company's distributors by encouraging rapid recruitment at the expense of retail sales (thus increasing all the risks associated with pyramid schemes) as well as the improper sales practices later disclosed in the 2016 10-K.

67.     The website *Behind MLM* discussed many of these problematic incentives in a December 8, 2015 post, which summarized "the core problem of LifeVantage's MLM opportunity" as follows:

> A.     Affiliates are forced to purchase product each month just to qualify for commissions, with this overriding any arguments about affiliates purchasing the product for any other reason.
>
> *The compensation plan itself then lends itself to affiliate autoship recruitment*, with this guaranteed because *every* affiliate *must* have a standing autoship order to qualify for commissions.
>
> Additional incentives pushing autoship recruitment include the bumping of the Fast Start Bonus to 40% with a 200 PV a month autoship order and the Matching Residual Bonus.

Given the autoship focus, it's likely that most LifeVantage affiliates will qualify for the full bonus by having a 200 PV a month autoship order.

The bonus itself meanwhile is also likely to be mostly paid out volume-wise on autoship orders by recruited affiliates.

The *affiliate packs also delve into pay-to-play territory*, with the more an affiliate spending on the pack equating to higher commission rates.

These commissions are paid out when recruited affiliates purchase the packs, with them essentially serving as high-priced recruitment aids.

Again the products bundled with the packs are designated irrelevant, because there's a direct financial incentive attached to each pack purchase.

Worse still, those who order the cheaper packs are punished with the halving of commissions when recruited affiliates purchase the more expensive packs.

B.      Perhaps the most alarming aspect of LifeVantage's compensation plan documentation however was the complete absence of retail commission information.

As it stands *it is unclear whether LifeVantage pay commissions on retail orders* (preferred customers orders are paid out residually through the unilevel).

One possibility is that retail orders pay out through the unilevel, which would equate to a 2% commission per order.

This is in line with LifeVantage's otherwise complete lack of focus on retail sales, but I can't say whether it's the case for sure.

C.      Either way, the fact that LifeVantage's compensation plan doesn't mention retail sales speaks volumes.[4]

68.     Many of LifeVantage's new bonus pools and other incentives only made these

problems worse.

69.     According to a former employee who served as the Company's Director of

---

[4] *LifeVantage Review: No retail focus & mandatory autoship*, BehindMLM.com, Dec. 8, 2015,        http://behindmlm.com/mlm-reviews/lifevantage-review-no-retail-focus-mandatory-autoship/.

Recognition & Incentives from February 2009 to February 2016, distributors qualified for many of these incentives based not on their retail sales, but rather on their "organizational volume." For example, even today, LifeVantage's website advertises an opportunity to "Grow your Organizational Volume over the next 5 months to earn your way to Hawaii."[5] In LifeVantage's Compensation Plan, "organizational volume" is defined as "[t]he amount of product *consumed* or sold *by a distributor's entire downline organization*"—which includes the distributor's own "personal volume," which is defined as "[t]he amount of product personally *consumed* or sold *by a distributor* and/or their preferred customers."[6]

70.     This means distributors can qualify for such trips simply by making large purchases for personal use and by recruiting a downline person that also makes large purchases—regardless of whether this results in any actual retail sales. This encourages "inventory loading," which "occurs when distributors make the minimum required purchases to receive recruitment-based bonuses without reselling the products to consumers." *Webster v. Omnitrition Int'l*, 79 F.3d 776, 783 n.3 (9th Cir. 1996). Inventory loading is one of the primary indicia of a pyramid scheme.

---

[5]    LifeVantage Hawaii '17, https://www.lifevantage.com/upcoming-events/hawaii-promotion-2017/ (last visited Feb. 23, 2017).

[6]    LifeVantage Compensation Plan at 7, available at http://www.thedoortohealthandwealth.com/ docs/CompensationPlanBrochure.pdf (last visited Feb. 23, 2017).

*See also* LifeVantage Compensation Plan Highlights, available at https://www.lifevantage.com/wp-content/uploads/2013/06/US-Compensation-Plan-Highlights-Flyer-V.04.pdf (last visited Feb. 23, 2017) (PV "may come from Preferred Customers, Retail Sales, and Personal Product Purchases"); LifeVantage USA Policies and Procedures (Apr. 1, 2015), at 11.1.1 – Sales Volume ("PV includes purchases made by the Independent Distributor and Direct Retail Customers" and "OV shall include the total PV of all Independent Distributors in his or her Marketing Organization plus the Independent Distributor's PV").

71.     According to allegations attributed to a former employee who served as the Company's Director of Recognition & Incentives from February 2009 to February 2016, inventory loading was a major problem at LifeVantage, especially in Hong Kong. According to the former employee, distributors would frequently buy large quantities of product so they could win a big commission or travel package, and then return the product as soon as they had collected the commission or returned from the trip. Some distributors did not even bother having the product shipped when placing their orders. LifeVantage would try to claw back the commission, but this was rarely possible if the distributor had already left the company.[7]

72.     The Director Defendants knew that LifeVantage had adopted incentives that actually encouraged this behavior by distributors.  According to the Company's 2015 Annual Report, which was signed by each Director, one of the Company's alleged competitive advantages was that the "compensation plan also enables independent distributors to earn compensation early and often as they sell our products. Some elements of our compensation plan are paid weekly, allowing new independent distributors to receive compensation quickly. We believe more frequent payment of compensation helps us retain new independent distributors by allowing them to experience success soon after enrolling."

73.     The Company's complete absence of internal controls designed to prevent inventory loading similarly facilitated improper sales practices.  For example, the absence of

---

[7] These product returns likely also contributed to the Company's inventory levels steadily increasing throughout the Relevant Period; by June 30, 2016, the Company had 270 days of inventory. On the December 12, 2016 call, Jaggi attributed this to "some forecasting in purchasing miscalculations that caused inventory to build beyond our internal goals." Jensen later stated "there were some miscalculations of our inventory needs relative to our position at the time, and we identified the issues and responded."

such internal controls facilitated distributors' practice of purchasing the Company's products in one country, ostensibly for personal use, and then selling them in another country where the products were not licensed or approved for sale.

74.     According to allegations attributed to a former employee, of all the product shipped to Hong Kong, only 10-15% remained there. The remaining 85-90% was shipped to "non-open markets" in Asia, including Vietnam, Malaysia, Singapore, and Taiwan, where it was not registered or licensed for sale. According to the former employee, much of this product was even labeled "not for resale," meaning it could not have been resold even in Hong Kong itself. The purchase of product, ostensibly "not for resale" but in quantities too large to be used by one person is a red flag suggesting either inventory loading or illegal sale. The Board of Directors abdicated its fiduciary duties by failing to ensure that the Company had any internal controls in place to detect such obvious abuses of not-for-resale status. Instead of taking action to cause the Company to adopt necessary internal controls in this area, the Board allowed management to actively incentivize these large purchases through the Company's compensation policies.

**B.  The Individual Defendants Cause the Company to Issue False and Misleading Statements**

75.     During the Relevant Period, the Individual Defendants caused the Company to issue false and misleading statements to the investing public.   Among other things, as demonstrated in detail below, the Individual Defendants caused the Company to represent that the Company had adopted and implemented internal controls which allowed LifeVantage to monitor and "systematically" review potential misbehavior by its independent distributors through the Company's internal compliance department. In reality, the Company completely lacked fundamental internal controls over its international distributors and its compliance with

applicable laws and regulations.

76.     On September 1, 2015, LifeVantage filed its 2015 Annual Report on Form 10-K,

which stated the following:

> **Our Culture**: We are committed to creating a culture for our independent distributors and employees that focuses on ethical, legal and transparent business practices. At enrollment, our independent distributors agree to abide by our policies and procedures. ***Our policies and procedures, when followed, ensure that our independent distributors comply with applicable laws and regulations. Our compliance department monitors the activities of our independent distributors as part of our effort to enforce our policies and procedures***. Similarly, our code of business conduct and ethics sets forth guidelines and expectations for our employees. We believe our ethical, legal and transparent culture attracts highly qualified employees and independent distributors who share our commitment to these principles.

77.     The 2015 10-K also represented the following with respect to its distributors'

alleged compliance with applicable laws and regulations:

**Distributor Compliance Activities**

> Given that our independent distributors are independent contractors, we do not control or direct their promotional efforts. We do, however, require that our independent distributors abide by policies and procedures that require them to act in an ethical manner and in compliance with applicable laws and regulations. As a member of the United States Direct Selling Association and similar organizations in many of the markets where we do business, we are also subject to the ethical business practices and consumer service standards required by the industry's code of ethics.

> Independent distributors must represent to us that their receipt of commissions is based on retail sales and substantial personal sales efforts. We must produce or pre-approve all sales aids used by distributors such as brochures and online materials. ***Products may be promoted only by personal contact or by collateral materials produced or approved by us.*** Independent distributors may not use our trademarks or other intellectual property without our consent.

> ***We monitor and systematically review alleged independent distributor misbehavior through our internal compliance department***. If we determine one of our independent distributors has violated any of our policies and procedures, we may discipline the independent distributor and may terminate the independent

distributor's rights to distribute our products. When necessary, we have brought legal action against independent distributors, or former independent distributors, to enforce our policies and procedures. Short of termination or legal action, we may impose sanctions against independent distributors whose actions are in violation of our policies and procedures. Such sanctions may include warnings, probation, withdrawal or denial of an award, suspension of privileges of a distributorship, fines and/or withholding of commissions until specified conditions are satisfied, or other appropriate injunctive relief.

78.     The 2015 10-K also stated the following, under Risk Factors:

Extensive federal, state, local and international laws regulate our business, products and direct selling activities. Because we have expanded into foreign countries, *our policies and procedures for our independent distributors differ slightly in some countries due to the different legal requirements of each country in which we do business*.

79.     The 2015 10-K also stated the following, under Risk Factors:

Our independent distributors are not employees and act independent of us. However, activities by our independent distributors that violate applicable laws or regulations could result in government or third-party actions against us, which could harm our business. ***Our independent distributors agree to abide by our strict policies and procedures designed to ensure our independent distributors will comply with legal requirements. We have a compliance department that addresses violations of our independent distributors when they become known to us***. However, given the size of our independent distributor network, we experience problems with independent distributors violating our policies and procedures from time to time and are not always able to discover or remedy such violations.

80.     The 2015 Annual Report was reviewed, approved, and signed by Defendants Jensen, Mauro, Jaggi, Beindorff, Manovich, Metzger, and Okumoto.

81.     The representations in the 2015 Annual Report were false and misleading because they implied that the Company had policies and procedures that differed in appropriate ways in "each country in which we do business," that the Company's compliance department monitored the distributors and enforced these policies, and that the Company had otherwise adopted controls capable of providing reasonable assurance that these policies were being followed. But

in fact, the Company completely lacked fundamental internal controls over its international distributors and the distributors' compliance with applicable laws and regulations.

82.    The 2015 Annual Report also contained certifications by Defendants Jaggi and Jensen stating:

1.    I have reviewed this Annual Report on Form 10-K of LifeVantage Corporation;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a- 15(f) and 15d-15(f)) for the registrant and have:

a.    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c.    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter

(the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

      a.      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

      b.      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

83.      On November 4, 2015, Jensen and the Board caused LifeVantage to issue a press release and file a current report on Form 8-K with the SEC announcing the Company's financial and operating results for the first quarter of fiscal year 2016, ended September 30, 2015. For the quarter, LifeVantage reported net income of $1.1 million, or $0.08 per diluted share, on revenue of $45.4 million, compared with net income of $4.7 million, or $0.32 per diluted share, on revenue of $51.6 million for the same period in the prior year. The press release quoted Jensen, who stated:

> *"Our first quarter results were in-line with our expectations and reflect stability in our revenue and operating results," stated LifeVantage President and Chief Executive Officer Darren Jensen.* **"In the quarter, we made progress on our growth plan that focuses on critical aspects of our business, including the launch of new technologies, brand differentiation, the introduction of new products, and international growth.** *Based on our year-to-date results and outlook for the remainder of the year, we are reiterating our annual guidance and continue to expect to achieve revenue, operating margin, and net income improvements in fiscal 2016."*

Mr. Jensen continued, "At our annual convention held last month, we were

encouraged by the record attendance and high level of distributor energy and engagement. We made a number of exciting announcements that improve the foundation of our business and our growth trajectory. We announced our European Union expansion plan with entry in the United Kingdom and Netherlands in February 2016. The EU is a large and growing region for direct selling, and we look forward to introducing European customers to LifeVantage products and capturing our share of the market. In addition, we enhanced our TrueScience™ Skin Care system with the launch of TrueScience™ Micro Lift Serum. This underscores our commitment to provide our distributors with new and demonstrative products."[8]

84.     On the same date, the Individual Defendants caused LifeVantage to file a quarterly report on Form 10-Q with the SEC, reiterating the financial and operating results stated in the press release for the first quarter of fiscal year 2016 (the "Q1 2016 10-Q").

85.     Pursuant to the Company's Audit Committee Charter, which was adopted in 2011, the Audit Committee members were required to review and approve the Company's quarterly financial results before such results were filed with the SEC.  Specifically, the Audit Committee charter states that its members are required to:  "Review with management and the independent auditor the Company's quarterly financial statements prior to the earlier of the release of quarterly earnings or the filing of the Company's quarterly report on Form 10-Q." Thus, upon information and belief, Defendants Okumoto, Mauro and Beindorff reviewed and approved the Company's Q1 2016 financial results on Form 10-Q and the Form 8-K before they were filed with the SEC and disseminated to the investing public.  In addition, they discussed these financial results with the Company's auditors before the financial results were filed.

86.     In addition, LifeVantage's Q1 2016 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by defendants Jensen and Jaggi,

---

[8] Unless otherwise noted, any emphasis in the quoted material in this Complaint has been added by Plaintiff.

stating that the information contained in the Q1 2016 10-Q fairly presented, in all material respects, the financial condition and results of operations of the Company, and fully complied with the requirements of section 13(a) or 15(d) of the Exchange Act.

87.    On November 4, 2015, the Company's stock price closed at $7.78.

88.    On January 8, 2016, the Individual Defendants caused LifeVantage to file a current report on Form 8-K with the SEC announcing that, effective January 4, 2016, the Board had increased the number of directors from five to seven, adding defendants Jensen and Toole to the Board.

89.    On February 9, 2016, the Individual Defendants caused LifeVantage to issue a press release and file a current report on Form 8-K with the SEC announcing the Company's financial and operating results for the second quarter of fiscal year 2016, ended December 31, 2015. For the quarter, LifeVantage reported net income of $1.6 million, or $0.11 per diluted share, on revenue of $52 million, compared with net income of $1.5 million, or $0.10 per diluted share, on revenue of $48.2 million for the same period in the prior year. The press release stated in part:

> "We are pleased to report revenue growth on both a sequential and year-over-year basis, which underscores the early success of our growth plan and gives us confidence that our business is on a path to deliver long-term and sustainable improved financial performance," stated LifeVantage President and Chief Executive Officer Darren Jensen. "In the second quarter, we made meaningful progress on our critical growth initiatives to expand our product portfolio with the launch of PhysIQ™ Smart Weight Management System, marking our entry into the estimated $148 billion worldwide weight management market. While it is still in its very early stages, we have been encouraged by the strong consumer and distributor responses to our newest product offerings. In addition, we expanded our skincare product offering with the launch of True Science™ Micro Lift Serum in the second quarter."
>
> Mr. Jensen concluded, "*We continue to make progress across all aspects of our*

*growth plan*, including investments in distributor leadership development, mobile technology with the introduction of new business building technologies, new products, brand development, and international expansion. Our strategic plan focuses on changing the revenue trends to a positive trajectory and we are pleased that revenue is responding to these investments. Nevertheless, these investments will impact our operating income results in the near-term. However, we are confident that investing in our future growth will better position our company to capitalize on opportunities ahead and achieve accelerated sales growth."

90.    On the same date, the Individual Defendants caused LifeVantage to file a quarterly report on Form 10-Q with the SEC, reiterating the financial and operating results stated in the press release for the second quarter of fiscal year 2016 (the "Q2 2016 10-Q"). The Audit Committee charter states that its members are required to: "Review with management and the independent auditor the Company's quarterly financial statements prior to the earlier of the release of quarterly earnings or the filing of the Company's quarterly report on Form 10-Q." Thus, upon information and belief, Defendants Okumoto, Mauro and Beindorff reviewed and approved the Company's Q2 2016 financial results on Form 10-Q and the Form 8-K before they were filed with the SEC and disseminated to the investing public. In addition, they discussed these financial results with the Company's auditors before the financial results were filed.

91.    In addition, LifeVantage's Q2 2016 10-Q contained signed certifications pursuant to SOX by defendants Jensen and Jaggi, stating that the information contained in the Q2 2016 10-Q fairly presented, in all material respects, the financial condition and results of operations of the Company, and fully complied with the requirements of section 13(a) or 15(d) of the Exchange Act.

92.    On April 13, 2016, the Individual Defendants caused LifeVantage to file a current report on Form 8-K with the SEC announcing the dismissal of its independent registered public

accounting firm and the engagement of BDO.  The dismissal was authorized by Defendants

Okumoto, Mauro and Beindorff.  The April 13, 2016 Form 8-K stated, in part:

### Dismissal of EKS&H LLLP

On April 8, 2016, LifeVantage Corporation (the "Company") dismissed EKS&H LLLP ("EKS&H") as the Company's independent registered public accounting firm. ***The dismissal was authorized by the Audit Committee of the Company's Board of Directors.***

The reports of EKS&H on the Company's consolidated financial statements as of and for the fiscal years ended June 30, 2015 and June 30, 2014 and the effectiveness of internal control over financial reporting as of June 30, 2015 and 2014, did not contain any adverse opinion or disclaimer of opinion, nor were they qualified or modified as to uncertainty, audit scope or accounting principle.

In connection with the audits of the Company's financial statements for each of the two most recent fiscal years ended June 30, 2015 and June 30, 2014 and in the subsequent interim periods through April 8, 2016, there were no disagreements with EKS&H on any matters of accounting principles or practices, financial statement disclosure or auditing scope or procedure, which, if not resolved to the satisfaction of EKS&H, would have caused EKS&H to make reference to the matter in their report. In addition, during the two most recent fiscal years and the subsequent interim period through April 8, 2016, there were no reportable events described under Item 304(a)(1)(v) of Regulation S-K.

The Company has provided EKS&H with a copy of the above disclosure and has requested that EKS&H furnish it a letter addressed to the United States Securities and Exchange Commission stating whether it agrees with the above statements and, if not, stating the respects in which it does not agree. A copy of the letter of EKS&H dated April 12, 2016 is filed as Exhibit 16.1 to this Form 8-K.

### Engagement of BDO USA, LLP

Effective as of April 12, 2016, ***the Audit Committee of the Company's Board of Directors engaged BDO USA, LLP ("BDO") as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2016***.

93.    Prior to hiring BDO, Defendants Okumoto, Mauro and Beindorff failed to

properly analyze whether BDO was independent.  The Company's Audit Committee Charter

specifically required Okumoto, Mauro and Beindorff to "select and retain an independent registered public accounting firm to act as the Company's auditors for the purpose of auditing the Company's financial statements, books, records, accounts and internal controls over financial reporting." Indeed, according to the company's press release announcing the hiring of BDO, the selection of BDO was performed by the Audit Committee itself: "The decision to appoint BDO followed the Audit Committee's comprehensive review of audit proposals from firms with the resources to support the company's broadening global footprint…BDO has the scale and experience to support LifeVantage's growth for years to come."

94.     In fact, BDO was not independent and Okumoto, Mauro and Beindorff were reckless in not performing an adequate assessment of BDO's independence, thereby breaching their duty of loyalty to LifeVantage.

95.     On May 4, 2016, the Individual Defendants caused LifeVantage to issue a press release and file a current report on Form 8-K with the SEC announcing the Company's financial and operating results for the third quarter of fiscal year 2016, ended March 31, 2016. For the quarter, LifeVantage reported net income of $1.0 million, or $0.07 per diluted share, on revenue of $56.2 million, compared with net income of $0.6 million, or $0.04 per diluted share, on revenue of $45.2 million for the same period in the prior year. The revenues represented an increase of 24.4% over the prior year. The press release stated in part:

> "We are excited about our ***record revenue performance during the third quarter***. We are seeing positive trends in our existing business, leading up to what may be the biggest new product launch in the company's history with the upcoming May 17th cyber launch of NRF1," stated LifeVantage President and Chief Executive Officer Darren Jensen. "We are successfully combining visionary product innovation with a highly duplicatable business opportunity, further enabling our independent distributors to be successful. The results are evident in our sales growth."

**Third Quarter Fiscal 2016 Results**

For the third fiscal quarter ended March 31, 2016, the Company reported revenue of $56.2 million, a 24.4% increase compared to $45.2 million for the comparable period in fiscal 2015; and an 8.0% increase compared sequentially to revenue of $52.0 million for the second fiscal quarter ended December 31, 2015. Year-over-year quarterly revenue reflects an increase of 33.8% in the Americas and a decrease in the Asia/Pacific & Europe region of 0.9%.

96.     On the same date, the Individual Defendants caused LifeVantage to file a quarterly report on Form 10-Q with the SEC, reiterating the financial and operating results stated in the press release for the third quarter of fiscal year 2016 (the "Q3 2016 10-Q"). Upon information and belief, Defendants Okumoto, Mauro and Beindorff reviewed and approved the Company's Q3 2016 financial results on Form 10-Q and the Form 8-K before they were filed with the SEC and disseminated to the investing public. In addition, they discussed these financial results with the Company's auditors before the financial results were filed.

97.     LifeVantage's Q3 2016 10-Q contained signed certifications pursuant to SOX by defendants Jensen and Jaggi, stating that the information contained in the Q3 2016 10-Q fairly presented, in all material respects, the financial condition and results of operations of the Company, and fully complied with the requirements of section 13(a) or 15(d) of the Exchange Act.

98.     On July 13, 2016, just three months after hiring BDO, Defendants Okumoto, Mauro and Beindorff caused LifeVantage to file a current report on Form 8-K with the SEC that announced the dismissal of BDO and the engagement of WSRP, LLC as its new independent registered public accounting firm. The Form 8-K stated in part:

**Dismissal of BDO USA, LLP**

*On July 7, 2016, the Audit Committee of the Board of Directors of LifeVantage Corporation (the "Company") dismissed BDO USA, LLP ("BDO") as the Company's independent registered public accounting firm, effective immediately, due to BDO's determination that it was not independent of the Company with respect to the Company's fiscal year ended June 30, 2016 ("Fiscal 2016")*, and not for any reason related to the Company's financial reporting or accounting operations or policies. BDO concluded that it was not independent of the Company with respect to Fiscal 2016 because, during Fiscal 2016 but *prior to BDO's appointment as the Company's independent registered public accounting firm, a firm in the BDO international network had provided certain prohibited non-audit services as a subcontractor to a third party contractor who had been engaged to provide payroll services to an international subsidiary of the Company*. Background relating to these non-audit services is described below.

In 2012, the Company engaged a third party (FMP), among other things, to provide payroll and human resources services to LifeVantage Japan KK, a foreign subsidiary of the Company. In 2013, FMP outsourced the payroll component to a subcontractor, Tokyo Xborder Tax Co. In October 2015, Tokyo Xborder Tax Co. joined the BDO international network and changed its name to BDO Tax Co. (Japan). The Company terminated its relationship with FMP effective March 31, 2016 and payroll services through FMP and its subcontractor, BDO Tax Co. (Japan), ceased on that date. On April 12, 2016, the Audit Committee of the Company's Board of Directors engaged BDO as its independent registered public accounting firm for Fiscal 2016. At that time, the Company had terminated its relationship with FMP and was unaware that FMP's subcontractor had joined the BDO international network and changed its name. BDO recently learned of the payroll processing services in connection with its audit procedures for Fiscal 2016 and was unaware of these services at the time of its appointment as the Company's independent registered public accounting firm on April 12, 2016.

Prior to the determination by BDO that it was not independent, neither the Company nor BDO believed that there were any issues relating to BDO's independence. BDO was engaged by the Company on April 12, 2016 and as a result did not deliver an audit report on the financial statements of the Company for the fiscal years ended June 30, 2014 or 2015. At no point during BDO's engagement were there any (i) disagreements with BDO on any matter of accounting principles or practices, financial statement disclosure or auditing scope or procedure, which, if not resolved to the satisfaction of BDO would have caused it to make reference to the subject matter of the disagreement in connection with its report, or (ii) "reportable events" as defined in Item 304(a)(1)(v) of Regulation S-K.

The Company has provided BDO with a copy of the above disclosure and has requested that BDO furnish it a letter addressed to the United States Securities and Exchange Commission stating whether it agrees with the above statements and, if not, stating the respects in which it does not agree. A copy of the letter of BDO dated July 13, 2016 is filed as Exhibit 16.1 to this Current Report on Form 8-K.

**Engagement of WSRP, LLC**

Effective as of July 11, 2016, the Audit Committee of the Company's Board of Directors engaged WSRP, LLC as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2016. During the Company's two most recent fiscal years and the subsequent interim period through July 11, 2016, neither the Company nor anyone acting on its behalf consulted with WSRP, LLC regarding either (i) the application of accounting principles to a specified transaction, either completed or proposed, or the type of audit opinion that might be rendered on the Company's consolidated financial statements, or the effectiveness of internal control over financial reporting, where either a written report or oral advice was provided to the Company that WSRP, LLC concluded was an important factor considered by the Company in reaching a decision as to the accounting, auditing or financial reporting issue; or (ii) any matter that was either the subject of a disagreement (as defined in Item 304(a)(1)(iv) of Regulation S-K and the related instructions) or a reportable event as described in Item 304(a)(1)(v) of Regulation S-K.

99.     On July 19, 2016, the Individual Defendants caused LifeVantage to file an amended quarterly report on Form 10-Q with the SEC for the third quarter of fiscal year 2016 (the "Amended Q3 2016 10-Q").  The Amended Q3 2016 10-Q stated in part:

This Amendment No. 1 to the Quarterly Report on Form 10-Q (the "Amendment") of Lifevantage Corporation (the "Company") for the quarterly period ended March 31, 2016, as filed with the Securities and Exchange Commission (the "SEC") on May 4, 2016 (the "Original Filing"), is being filed to disclose that our current independent registered public accounting firm, WSRP, LLC ("WSRP"), has completed its review of the unaudited interim financial information for the quarterly period ended March 31, 2016 presented in the Original Filing under Public Company Accounting Oversight Board AU 722, as required by SEC rules, and to provide new Section 906 certifications. This Amendment includes amendments of (i) Part I, Item I, to include a report from WSRP; (ii) Part II, Item 6 to include new certifications as reflected in Exhibits 31.1, 31.2, 32.1 and 32.2 and to provide an acknowledgment from WSRP regarding the unaudited interim financial

statements, as reflected in Exhibit 15.1 and (iii) Exhibit 101 to replace the related XBRL files to this Form 10-Q/A which incorporates XBRL references to subsequent events occuring [sic] after the original filing. No other changes have been made to the Original Filing. Following WSRP's review, this Amendment was not, and is not required to be, updated to reflect any events or transactions occurring after the date of the Original Filing, or modify or update disclosures that may have been affected by events or transactions occurring subsequent to such filing date, and, except as described above, all information and exhibits included in the Original Filing remain unchanged.

100.    Upon information and belief, Defendants Okumoto, Mauro and Beindorff reviewed and approved the Company's Amended Q3 2016 financial results on Form 10-Q before they were filed with the SEC and disseminated to the investing public.  In addition, they discussed these financial results with the Company's auditors before the financial results were filed. The Amended Q3 2016 10-Q also contained signed certifications pursuant to SOX by defendants Jensen and Jaggi, stating that the information contained in the Amended Q3 2016 10-Q fairly presented, in all material respects, the financial condition and results of operations of the Company, and fully complied with the requirements of section 13(a) or 15(d) of the Exchange Act.

101.    During the Relevant Period, due to the misstatements and omissions by the Individual Defendants, the stock price continued to artificially rise, reaching a high of $15.97 on July 12, 2016.

## REASONS STATEMENTS WERE IMPROPER

102.    The true facts, which were known or recklessly disregarded by the Individual Defendants, but were concealed from the investing public, were as follows:

(a)    LifeVantage lacked effective internal controls;

(b)    As a result, LifeVantage improperly accounted for sales and revenues in

certain international markets; and

(c)     As a result of the foregoing, LifeVantage's public statements were

materially false and misleading at all relevant times.

103.    As a result of the Individual Defendants' false and misleading statements and omissions, LifeVantage shares traded at artificially inflated prices during the Relevant Period. Once the true facts regarding the Company's inadequate financial controls and accounting began to emerge, investors sold LifeVantage stock, causing the Company's stock price to fall $1.32 per share to close at $9.08 per share on September 14, 2016, erasing millions of dollars in market capitalization. Thereafter, the stock continued to tank, and at the time of the filing of this complaint was trading at just $6.19 per share.

### LifeVantage's Inadequate Internal Controls

104.    As it later admitted in its 2016 Annual Report, LifeVantage failed to maintain an adequate system of internal controls with respect to compliance with applicable laws and regulations.

105.    It was the ***Board of Directors' responsibility*** to ensure that LifeVantage adopted and implemented adequate internal controls necessary to ensure that the Company maintained compliance with applicable laws and regulations. LifeVantage's Audit Committee Charter specifically states that:

> ***The [Audit] Committee's responsibility is to oversee*** the accounting and financial reporting processes of the Company and audits of its financial statements and ***the effectiveness of the Company's internal control over financial reporting.***

106.    Legal scholars agree that ***it is the board's responsibility*** to ensure that a publicly-traded company has adequate internal controls in place. *See, e.g.,* Melvin A. Eisenberg, "The

Board of Directors and Internal Control," 19 CARDOZO L. REV. 237, 244 (1997) ("A more significant question is where ultimate responsibility for internal control should be vested. There are two reasons why this responsibility should be vested in the board.").

107.    The Committee of Sponsoring Organizations of the Treadway Commission ("COSO") has issued a seminal report entitled *Internal Control—Integrated Framework* (the "COSO Report").[9] The COSO Report was designed to provide a broad framework through which corporations could assess the effectiveness of their internal controls.  The COSO Report defines an "internal control" as "a process, effected by an entity's board of directors, management, and other personnel, designed to provide reasonable assurance regarding the achievement of objectives" related to the "effectiveness and efficiency of operations, reliability of financial reporting, [and] compliance with applicable laws and regulations." More broadly, however, a system of internal controls encompasses more than the policies governing the objectives related to operations, financial reporting, and compliance; namely, it includes the actions taken by a company's board of directors, management at all levels, and employees in running the business.

108.    The COSO Report is considered to contain the most definitive treatment of internal control.  In 1994, the ABA's Committee on Law and Accounting reported that "[t]he COSO Report may well become the standard for defining internal control and its interrelated components, and for measuring the effectiveness of internal control. The Report has serious implications for all entities and their managements and for their outside financial, accounting,

---

[9] The COSO report was originally issued in September 1992 as a four-volume set. An *Addendum to Reporting to External Parties* was issued in May 1994. On May 14, 2013, COSO released an updated version of the entire framework.

legal, and other advisors as well."[10]

109.    The COSO Report describes internal control as "consist[ing] of five interrelated components" that "are derived from the way management runs a business, and are integrated with the management process." The five components of an internal control framework that are needed to enable a business to achieve its objectives are: (1) the control environment, (2) risk assessment, (3) control activities, (4) information and communications and (5) monitoring.

110.    SEC rules also require management to evaluate a company's internal controls and disclose every material weakness they are aware of. *See Management's Report on Internal Control over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports*, 68 Fed. Reg. 36636, 36639 (June 18, 2003).

111.    A "material weakness" is defined as "a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the registrant's annual or interim financial statements will not be prevented or detected on a timely basis."[11] Significantly, a material weakness in internal controls over financial reporting can exist even when financial statements are not materially misstated.[12] The severity of a control deficiency does not depend upon whether a misstatement actually occurred, but rather on whether there is a "reasonable possibility" that the company's controls will fail to prevent or detect a misstatement.

112.    In the 2015 10-K and in many of the Company's 10-Qs, Defendants represented

---

[10] Committee on Law and Accounting, ABA, "Management" Reports on Internal Control: A Legal Perspective, 49 BUS. LAW. 889, at 899 (1994).
[11] 17 C.F.R. § 240.12b-2.
[12] PCAOB Auditing Standard No. 5, *An Audit of Internal Control Over Financial Reporting that Is Integrated with an Audit of Financial Statements*.

that LifeVantage's internal control over financial reporting did not contain any material weaknesses. But, as was disclosed in the 2016 10-K, LifeVantage had internal control deficiencies that rose to the level of "a material weakness in [LifeVantage's] internal controls over financial reporting." In particular, the Company:

(a)   "had ***sold our products to independent distributors who carried or shipped such products primarily into four countries outside the U.S. in which those products are not registered*** or that otherwise impose stringent restrictions on our direct selling model"

(b)   "***allowed individuals who were resident*** in countries that impose stringent restrictions on our direct selling model ***to enroll as independent distributors***"; and

(c)   "***did not have in place sufficient controls governing our international business policies, practices, monitoring and training to provide reasonable assurance*** that such distribution of our products complied with applicable customs, tax and other regulatory requirements."

113.   These problems arose because of fundamental deficiencies in the Company's controls. Specifically, the "inadequate controls and processes related to the ***lack of documented country-specific policies and procedures*** governing (i) ***distributor enrollment*** policies and procedures; (ii) ***approved distributor payment and collection methods***; (iii) ***methods for shipping and order fulfillment***; (iv) ***approval requirements for transactions with distributors*** outside of our approved compensation plans; and (v) lack of change controls related to changes to existing country-specific policies and procedures." In addition, the Company "had inadequate

controls in place related to the ***training, monitoring and oversight of our personnel*** who were involved in or managed our international business operations."

114.   Thus, LifeVantage has admitted that there was a failure to address significant deficiencies related to LifeVantage's compliance with applicable laws. The Company shipped products into certain countries without being properly registered and inappropriately used independent distributors in connection with its direct selling method. Furthermore, ***there was a complete lack of internal controls over certain international practices including the lack of monitoring and training to ensure that the company was complying with customs, tax and certain regulatory requirements***.

115.   Because of the complete absence of internal controls regarding distributor enrollment policies and procedures, distributors were able to enroll even if they lived in countries that banned LifeVantage's MLM business model. As a result of the absence of such internal controls, distributors were often able to create multiple accounts in order to avoid paying taxes.

116.   LifeVantage's 2016 Annual Report acknowledged that improper sales practices took place not just in FY 2016, but also in FY 2015. Specifically, the 2016 10-K estimated that approximately $17.3 million in net revenue in FY 2016, and $6.7 million in FY 2015, "related to sales of our products to independent distributors who may have carried or shipped such products into countries in which our products are not registered or that otherwise impose stringent restrictions on our direct selling model." Accordingly, the same lack of internal controls that were disclosed in the 2016 10-K were also absent as of June 30, *2015*. Nevertheless, in the 2015 10-K, management (including the Individual Defendants) stated that based on their evaluation, the Company's internal control over financial reporting, as well as its disclosure controls and

procedures (as defined in 17 C.F.R §240.13a-15), were effective as of June 30, 2015. These statements were thus false and misleading.

### The Company is Forced to Amend Jensen's Employment Agreement and Make It Subject to a Yet-to-Be-Enacted Clawback Policy

117.    On December 6, 2016, the Board of Directors of the Company approved an amendment and restatement of the employment agreement (the "Amended Agreement") between the Company and Defendant Jensen.

118.    While the Company stated that the amendment was designed to strengthen certain nonsolicitation and noncompete restrictive covenants that apply to Mr. Jensen, LifeVantage also disclosed that the amendment "makes explicit that *a Company incentive compensation clawback policy will apply when adopted to Mr. Jensen's qualifying incentive compensation*."

119.    This revelation was significant because it was a belated recognition by the Company that the lack of one very important internal control – a clawback policy requiring executives to return incentive compensation when the executive engages in wrongdoing – was completely absent at LifeVantage during the Relevant Period.  The failure of the Board to cause the Company to adopt a clawback policy was a breach of the directors' duty of loyalty since the absence of the policy constituted implied consent by the directors to allowing the Company's executives to recklessly pursue profit at the expense of legal compliance.  Indeed, the "eight point plan" adopted by the Board and the sales incentives approved by the Board allowed the Company's senior executives, in the absence of a clawback policy, to expose the Company to significant damages without putting the executives' incentive compensation at risk.

120.    According to the Company's filing, Lifevantage still has not adopted a clawback policy.  The December 6, 2016 filing stated that the "*clawback policy will apply when adopted*,"

thus conceding that the clawback policy has not yet been adopted or implemented.

121.    The failure of the Board to ensure that LifeVantage had an executive incentive compensation clawback policy during the Relevant Period constituted bad faith and a breach of the directors' duty of loyalty to the Company.

## THE TRUTH BEGINS TO EMERGE

122.    On September 13, 2016, the Company issued a press release and filed a current report on Form 8-K with the SEC, announcing that there would be a delay in the release of the Company's financial results for the fourth quarter and fiscal year 2016. The press release stated in part:

> *LifeVantage Corporation (NASDAQ: LFVN) today announced that it will delay the release of its fourth quarter and fiscal year 2016 financial results. Following an internal review by Company personnel of its policies and procedures, the Company is in the process of reviewing its sales into certain international markets and the revenue and income tax accruals associated with such sales.* The Company is currently unable to estimate the impact of the review to net revenue, tax expense, net income or other aspects of its financial statements for the fiscal year ended June 30, 2016 or any potential prior periods. The Audit Committee of the Company's Board of Directors is conducting an independent review of these matters and has retained independent counsel to assist in that review.
>
> *The review relates to sales of the Company's products in certain international markets and the determination of revenue and the deductibility of commission and incentive expenses associated with such sales, as well as the policies and procedures related to sales in those specific markets.* The Company will experience a delay in the timely filing of its Annual Report on Form 10-K for its fiscal year ended June 30, 2016 (the "Form 10-K") and expects to file a notification of late filing on Form 12b-25 with the Securities and Exchange Commission to obtain an automatic 15-day extension of the filing deadline for the Form 10-K. There can be no assurance that the Company will complete the preparation and filing of the Form 10-K within the extension period.
>
> LifeVantage President and Chief Executive Officer Darren Jensen stated, "We

regularly review our policies and procedures to ensure the utmost accuracy and transparency in our financial reporting. Our Board's Audit Committee has engaged independent external resources to review our policies and procedures and  support our team in finalizing our financial results for fiscal 2016."

The Company will not be in a position to release financial results for the fiscal year ended June 30, 2016 until the independent review by the Audit Committee is completed. The Company is working diligently on this matter and will, as soon as practicable, make a further announcement regarding the updated timing of the release of financial results and a conference call on its financial results.

123.    On this news, LifeVantage stock price sharply declined, falling $1.32 per share, about 12.79%, to close at $9.08 per share on September 14, 2016, erasing millions of dollars in market capitalization.

124.    On September 20, 2016, StreetInsider published an article on its website entitled "Is LifeVantage Playing Musical Chairs With Its Auditors?" which stated that the Company "is facing many special issues surrounding not just its products, but also concerning its financials and its claims of great health and longevity for the consumer and his/her dog." The article also detailed the multiple changes in the Company's auditors over the past few years. According to the article:

We reviewed LifeVantage's annual financial statements (forms 10-K) filed with the SEC from 2008 to 2015. On January 30, 2008, the company retained the audit firm of EKS&H, LLLP (a firm with over 60 partners and 650 employees) as its independent registered public accounting firm beginning with the three months ended December 31, 2007. The company used EKS&H from FY 2007 through the filing of its 2015 annual report on September 1, 2015. On or about April 12, 2016,  the company fired EKS&H.

On April 12, 2016, the company hired BDO USA, LLP as its new independent public accounting firm. According to the company's press release, "The decision to appoint BDO followed the Audit Committee's comprehensive review of audit proposals from firms with the resources to support the company's broadening global footprint…BDO has the scale and experience to support LifeVantage's  growth for years to come." BDO is among the top 10 largest accounting firms in  the US.

Less than three months later, on July 7th, the company announced its termination of BDO effective immediately because "a firm in the BDO international network had provided certain prohibited non-audit services as a subcontractor to a third party contractor who had been engaged to provide payroll services to an international subsidiary of the Company."

A few days later on July 11th, LFVN retained WSRP, LLC as its new independent auditor. WSRP is a Utah-based CPA firm with approximately 14 partners and less than 100 employees. The company's primary reason for hiring BDO in April was to hire a firm large enough to "support the company's broadening global footprint." If that's the case, why then is the company now hiring a much smaller firm than both BDO and EKS&H? We will let the reader chew on that particular piece of cud and make a determination for him or herself.

125.   The article further discusses ongoing issues with the Company's products,

explaining:

Another issue overhanging the stock it its product claims which are misleading at best and outright untrue at worst. LifeVantage's website claims that Dr. Joe McCord is "the scientist behind Protandim," the company's flagship product. The current version of Protandim is in fact a combination of 5 common herbal ingredients including turmeric and green tea. It was invented following "months of extensive research and development" in 2004 by Lifeline (the precursor to LifeVantage) employees Paul Myhill and William Driscoll, a former oil company executive, who together hold the patent on the product. The product was launched in February of 2005. Later that year, Myhill and Driscoll resigned from the company. The following year, biochemist Dr. Joe McCord joined the LifeVantage board of directors as its Director of Science. Dr. McCord served as spokesperson for Protandim and was responsible for distributor training and product research.

On April 13th, 2012, Paul Myhill published an open letter on Facebook saying, LifeVantage's "communications are downright false and misleading", and "perpetuate an ongoing fraud - one that the SEC and FTC should be made aware of." To prove that his words weren't empty threats, Myhill posted proof in the form of a letter from McCord himself saying that he couldn't take credit for inventing Protandim, because "it was so close to its final embodiment prior to the beginnings of our association." This showed that McCord didn't take 41 ingredients and whittle it down to 5 as he had claimed.

. . .

What really inspires angst with us is the information regarding Protandim at the website ClinicalTrials.gov. The site includes 4 actual human clinical trials which are listed below with the corresponding results for each:

[Each of the four studies described was either withdrawn or has no results posted.]

Protandim doesn't seem to be the panacea for all ills as the company would have you believe. Rather, the 4 failed clinical trials suggest the compound is ineffective at best in humans and harmful at worst. There are absolutely no clinical trials to show that the company's product will extend life, give more youthful skin, or help your dog. To top it all off, the company's shares are trading at a significant premium above its peers. Given all of the above, a price target of $6.00 is more than generous.

126.    On September 30, 2016, LifeVantage announced that it had received a notice ("Notice") from NASDAQ stating that because the Company had not yet filed its Annual Report on Form 10-K for the fiscal year ended June 30, 2016 (the "Form 10-K"), the Company is no longer in compliance with NASDAQ Listing Rule 5250(c)(1).  Nasdaq Listing Rule 5250(c)(1) requires listed companies to timely file all required periodic financial reports with the SEC.

127.    The Notice stated that the Company has 60 calendar days to submit to NASDAQ a plan to regain compliance with the NASDAQ Listing Rules. If NASDAQ accepts the Company's plan, then NASDAQ may grant the Company up to 180 days from the prescribed due date for filing the Form 10-K, or until March 27, 2017, to regain compliance.

**The Company Files its 2016 Form 10-K, and Announces the Completion of Its Internal Investigation, Which Found Material Weaknesses in Internal Controls**

128.    On December 12, 2016, LifeVantage announced the filing of its financial results for the fiscal year ending June 30, 2016.  LifeVantage's 2016 Form 10-K disclosed the following financial results:

**Results of Operations**
For the fiscal years ended June 30, 2016, 2015, and 2014, we generated net revenues

of $206.5 million, $190.3 million and $214.0 million, respectively, recognized operating profit of $13.4 million, $13.9 million and $19.4 million, respectively, and recognized net income of $6.0 million, $7.0 million and $11.4 million, respectively.

The following table presents certain consolidated earnings data as a percentage of net revenue for the years indicated:

| | For the years ended, | | |
| --- | --- | --- | --- |
| | June 30, 2016 | June 30, 2015 | June 30, 2014 |
| Revenue, net | 100.0 % | 100.0 % | 100.0 % |
| Cost of sales | 16.4 | 14.7 | 15.5 |
| Gross profit | 83.6 | 85.3 | 84.5 |
| Operating expenses: | | | |
| Commissions and incentives | 49.9 | 47.8 | 48.9 |
| Selling, general and administrative | 27.1 | 30.1 | 26.5 |
| Total operating expenses | 77.0 | 77.9 | 75.4 |
| Operating income | 6.6 | 7.4 | 9.1 |
| Other income (expense): | | | |
| Interest expense | (1.6) | (1.6) | (1.5) |
| Other income (expense), net | (0.7) | (0.1) | 0.2 |
| Total other income (expense) | (2.3) | (1.7) | (1.3) |
| Income before income taxes | 4.3 | 5.7 | 7.8 |
| Income tax expense | (1.3) | (1.9) | (2.5) |
| Net income | 3.0 % | 3.8 % | 5.3 % |

129.    LifeVantage's Form 10-K admitted that the problems with the Company's distributors in international markets adversely affected the Company's revenues, and would continue to adversely affect revenues in the future:

**Comparison of Fiscal Years Ended June 30, 2016 and 2015**

*Revenue, net.* We generated net revenue of $206.5 million and $190.3 million during the years ended June 30, 2016 and 2015, respectively. The overall increase included increases in the Americas region, offset by decreases in the Asia/Pacific & Europe region. Foreign currency fluctuations negatively impacted our net revenue $1.8 million or 1.0%, which is related primarily to our Asia/Pacific & Europe region. The overall increase in sales of $16.2 million in fiscal 2016 was due to increased sales in the Americas region as a result of new product launches and an increase in active distributors during the year. ***In the years ended June 30, 2016 and 2015, we estimate that approximately $17.3 million and $6.7 million in net revenue, respectively, related to***

*sales of our products to independent distributors who may have carried or shipped such products into countries in which our products are not registered or that otherwise impose stringent restrictions on our direct selling model.* Looking forward, we have taken steps to help ensure that our products are not distributed or sold into countries without complying with applicable customs, tax and other regulatory requirements and to appropriately verify the residency of individuals who want to become our independent distributors. Consistent with these regulatory requirements, in the future our independent distributors may be able to purchase a limited quantity of such products for personal consumption in one or more of these countries. Nevertheless, *we expect that our revenue in future periods from sales of our products that are carried or shipped into these countries will be significantly lower than fiscal 2016.*

130.    When it filed its Annual Report for Fiscal Year 2016, LifeVantage announced guidance for Fiscal Year 2017, stating:  "The Company is introducing fiscal year 2017 annual guidance. The Company expects to generate revenue in the range of $207 million to $212 million during fiscal year 2017, and anticipates adjusted earnings per diluted share in the range of $0.40 to $0.47. The Company's earnings per diluted share guidance excludes any non-operating or non-recurring expenses that may materialize during fiscal 2017, including estimated costs of $2.5 million to $3.0 million associated with the recently completed review by the Audit Committee of the Board of Directors."

131.    Thus, LifeVantage has admitted that the internal investigation cost the Company between $2.5 million and $3.0 million.

132.    At the time LifeVantage announced its 2016 results and Q1 2017 financial results, Defendant Mauro stated that the Audit Committee's internal investigation was triggered by an internal complaint from one of the company's employees in the tax department.  Moreover, Mauro stated that after the Audit Committee began its investigation, the Board received a formal complaint by another employee under the Sarbanes-Oxley Act ("SOX").

133.    In announcing the Audit Committee's results of the internal investigation,

-45-

Defendant Mauro said that the Audit Committee had determined that it had discovered material weaknesses related to internal controls over international sales, contrary to the Defendants' representations in prior SEC filings that the Company did maintain effective internal controls.

134.    In LifeVantage's 2016 Annual Report, its auditor issued a negative opinion about the Company's internal controls. The auditor's report in the Form 10-K stated:

> A material weakness related to the lack of sufficient controls surrounding the Company's international business policies, practices, monitoring and training has been identified and described in management's assessment. This material weakness was considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2016 financial statements, and this report does not affect our report dated December 12, 2016 on those financial statements.
> In our opinion, the Company did not maintain, in all material respects, effective internal control over financial reporting as of June 30, 2016, based on the COSO criteria.

135.    On the conference call with analysts on December 12, 2016 to discuss its 2016 fiscal year results and Q1 2017 results, LifeVantage admitted that documentation regarding persons purchasing Company's products in international markets was insufficient, and that there were "non-resident" persons who had been purchasing its products.  The Company admitted that the internal investigation had also determined that payments to international distributors were not adequately documented. In response to a question from an analyst, the Company said that some independent distributors were personally importing product into one market, and then re-selling the product into another market. The Company said approximately $17 million of sales, or 8%, were affected by these problems in 2016, causing the Company to lose such sales in fiscal year 2016.  During the call, the company also admitted that the Company's inventories were too high during 2016 and that there was "no excuse" for the inventory problems.

136.    In its 2016 Form 10-K, the Company described the results of the Audit

Committee investigation as follows:

### Audit Committee Independent Review

On September 13, 2016, we announced the delayed filing of this Annual Report on Form 10-K to allow the Audit Committee of our Board of Directors to conduct an independent review related to the distribution of our products into countries outside the U.S, in which those products are not registered or that otherwise impose stringent restrictions on our direct selling model, and the associated revenue and tax and other accruals associated with such sales. This independent review was initiated following internal reviews by Company personnel and was further informed by the content of employee complaints. The Audit Committee retained independent counsel to assist it in conducting the review. Based on its independent review, *the Audit Committee determined that (i) we had sold our products to independent distributors who carried or shipped such products primarily into four countries outside the U.S. in which those products are not registered or that otherwise impose stringent restrictions on our direct selling model; (ii) we allowed individuals who were resident in countries that impose stringent restrictions on our direct selling model to enroll as independent distributors; and (iii) we did not have in place sufficient controls governing our international business policies, practices, monitoring and training to provide reasonable assurance that such distribution of our products complied with applicable customs, tax and other regulatory requirements.* The inadequate controls and processes related to the lack of documented country-specific policies and procedures governing (i) distributor enrollment policies and procedures; (ii) approved distributor payment and collection methods; (iii) methods for shipping and order fulfillment; (iv) approval requirements for transactions with distributors outside of our approved compensation plans; and (v) lack of change controls related to changes to existing country specific policies and procedures. In addition, we had inadequate controls in place related to the training, monitoring and oversight of our personnel who were involved in or managed our international business operations. Accordingly, we identified a material weakness in our internal controls over financial reporting as of the period ended June 30, 2016.

137.    Significantly the Company has admitted that the changes it has been forced to make to its internal controls over matters affecting its international operations will continue to have a negative effect on sales throughout fiscal year 2017 (especially in Q2 2017) and into fiscal year 2018.

138.    In its Annual Report for 2016, LifeVantage also stated that it was in the process of trying to fix some of the problems with its materially defective internal controls, but could not estimate when the problems would be fixed.  The Form 10-K stated that LifeVantage cannot "at this time, estimate when such remediation will be completed. In addition, the remediation steps we have taken, are taking and expect to take may not effectively remediate the material weakness, in which case our internal control over financial reporting would continue to be ineffective."

139.    The Company provided additional details during the December 12, 2016 conference call. Defendant Mauro, Chairman of the Board, stated:

> During the FY16 closing process, employees in our tax department raised concerns about our international policies dealing with how our products are purchased or sold in some international markets, and taxes and tariffs associated with those sales. It's important to note that these potential policy weaknesses were identified internally.

> Once the Board was notified, our audit committee initiated an independent review utilizing independent external legal counsel and independent external accounting experts. A formal SOX complaint was submitted by  an employee after the review was underway, and the audit committee took  this information into account and evaluated and completed due diligence  on all issues raised. We analyzed transactions, policies, and procedures to determine if there were weaknesses and to determine why they may have  happened.

> We aspire to best practices in all areas, and the depth of this process was to ensure just that. The questions we addressed in our review revolved  around several policies and procedures concerning distributor activities in  select international markets. But *as the review progressed, the scope was  expanded to a general review of our policies and procedures across all international markets*.

> The type of activities reviewed included our *products being purchased for personal consumption and being taken into markets where they had not been approved for resale*. In general, most countries have an allowance for the personal importation of items for personal use; however, we identified an increase in this type of activity that needed additional review,  primarily for tariff and tax purposes. It is important that we have in place  the policies, procedures, and

internal systems to help ensure compliance, reduce the risk of abuse, and establish best practices well above our broader industries.

Once the review was concluded, we then took steps to implement the appropriate remedial measures. As part of this comprehensive review, we engaged international advisors with relevant country-specific expertise to help ensure our policies and procedures were appropriately aligned with local rules.

Finally, we could not issue our 10-K until all these steps were completed to ensure that we were fully compliant and to ascertain if there was any impact to our financial statements. Ultimately, other than the high cost of the external experts utilized in the review, which totaled approximately $2.5 million to $3 million, the impact to our delayed financials was negligible; however, *we concluded that we had material weaknesses in some of our international controls, and our auditors issued an adverse opinion relating to our internal control over financial reporting*.

We have already taken action to outsource our international tax and tariff responsibilities to help remediate this weakness. Our Board of Directors and the entire LifeVantage management team are committed to transparent, accurate, and thorough financial reporting and disclosure. While the duration of the review and filings delay was longer than we or our shareholders preferred, our number one goal was to complete a thorough and comprehensive evaluation. We utilized independent forensic accountants and outside counsel, both domestically and in international markets, to ensure thoroughness and to support our conclusions.

Our corporate philosophy is to ensure dedication to high-quality ethical business practices and financial reporting. We have now instituted best practices that will make us a stronger Company, with improved policies, procedures, and controls as a result.

140. Defendant Jensen then described "some of the remedial measures being implemented as a result of the recent review":

We are implementing changes that include enhanced support from our country-specific experts, including legal, tax, and customs advice. Given the complexity of operating in multiple international markets, we have also begun to outsource key activities where external support is more effective and efficient. Let me highlight some of the specific policy weaknesses discovered and the steps we have taken.

First, in certain markets, *the documentation and verification obtained during the enrollment process for people who wanted to become independent distributors was insufficient*. We have received local advice, and now, where

necessary, require in-person verification of local resident identification.

Second, we have instituted enhanced policies regarding the purchase for personal consumption of products in markets where such products are not registered or otherwise restrict our direct selling model.

Third, *policies regarding distributor payments were not appropriately documented in some markets*. We have strengthened these policies and instituted new controls covering payments in local markets and currencies.

Fourth, transfer pricing and commissions rebalancing procedures in international markets have been refined to more effectively provide for the consistency in cross-border purposes. For example, a distributor may purchase in one market with delivery to customers in another market where pricing, currency, and commission rates could vary.

Fifth, we have structurally aligned ourselves to outsource tax and tariff advisory functions to ensure we have access to the most up-to-date market-specific expertise.

Sixth, *we have started evaluating and reallocating our personnel to ensure that each market has adequate resources to support our enhanced processes and controls*. We will also establish and conduct Company-wide training programs.

We will continue to refine and update all of our international country operating and launch policies to ensure best practices are followed. The vast majority of these enhancements will improve our controls without any measurable impact to our distributors or our sales activities.

A few of the remedies being implemented will have, and in some cases, have already had, an impact on our sales levels. This impact materialized to a modest extent during the first quarter of FY17, as initial actions were taken during the review process. *We immediately eliminated substantially all nonresident purchases worldwide.*

Additionally, *new policies around verification of local market resident identification have interrupted sales in one market*. The impact to our in- market sales levels should be more evident in the second quarter. Our new policies will again allow nonresident purchases for personal consumption in markets where this practice is permitted.

We anticipate that in the third quarter, we will begin to regain a portion of these sales. I believe these enhanced policies and controls will provide proper

-50-

guidance within which we can build our global business opportunity.

141.    Jensen later added that the Company expected "second-quarter revenue in the range of $48 million to $49 million, which would be down sequentially versus the first quarter of FY17" because sales during the second quarter had been "negatively impacted by the disruption surrounding our policy changes affecting international markets."

142.    As one commentator noted:

LifeVantage's assessment that 8% of revenue or around $17 million in sales in fiscal 2016 were linked to questionable international sales practices is significant. ***That amount represents 100% of the company's revenue growth over the prior year***. LifeVantage reported revenue of $207 million in 2016, up $17 million from $190 million in 2015.[13]

143.    On this news, LifeVantage stock fell $1.02, or 10.53%, to close at $8.67 on December 13, 2016. The next day, it fell $0.32, or 3.69%, to close at $8.35 on December 14, 2016.

144.    At the same time, the Company also announced several management changes. First, on December 12, 2016, after the stock market closed, the Company filed a Form 8-K announcing that Defendant Jensen's employment agreement had been amended to "strengthen[] certain nonsolicitation and noncompete restrictive covenants," to "make[] explicit that a Company incentive compensation clawback policy will apply when adopted to Mr. Jensen's qualifying incentive compensation," and to reflect that Jensen had "agreed to waive for future fiscal years his rights to certain cash incentive bonus awards described in his original

---

[13]    Christine Richard, *Are Investors Underestimating The Risks To Herbalife's International Business?*, Seeking Alpha (Dec. 20, 2016), http://seekingalpha.com/article/4031549-investors-underestimating-risks-herbalifes-international-business.

employment agreement."

145.   Second, on December 15, 2016, the Company filed a Form 8-K announcing that the Company had "terminated the employment of Robert Urban, our Chief Operating Officer."

146.   Third, on January 18, 2017, three weeks after filing its delayed 2016 Annual Report, LifeVantage announced that it had fired Defendant Mark Jaggi, the Company's CFO. The announcement surprised the financial markets, especially since LifeVantage gave no reason for its CFO's departure and since Jaggi had been on the job less than a year and a half.  The firing was declared effective "immediately" and LifeVantage fired Jaggi before it had found a full-time replacement CFO.

147.   In response to the disclosure of Jaggi's termination, the price of LifeVantage's stock declined from $7.56 on January 18, 2017 to $7.17 on January 19, 2017.  It continued declining thereafter, reaching a new 52-week low of $6.39 on February 8, 2017.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

148.   By reason of their positions as officers, directors, and/or fiduciaries of LifeVantage and because of their ability to control the business and corporate affairs of LifeVantage, the Individual Defendants owed and owe the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage LifeVantage in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of LifeVantage and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

149.   Each director and officer of the Company owes to LifeVantage and its

shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

150.    In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock  would be based on truthful and accurate information.

**Audit Committee Duties**

151.    In addition to these duties, the members of the Audit Committee owed specific duties to LifeVantage under the Audit Committee's Charter to review and approve quarterly and annual financial statements and earnings press releases, and to ensure that the Company had appropriate and effective internal controls over financial reporting.

152.    Specifically, according to LifeVantage's Audit Committee Charter, the responsibilities of the Audit Committee are as follows:

> ***The Committee's responsibility is to oversee the accounting and financial reporting processes of the Company and audits of its financial statements and the effectiveness of the Company's internal control over financial reporting.*** Notwithstanding the foregoing, the Committee recognizes that the Company's management is responsible for preparing the Company's financial statements. Additionally, the Board recognizes that the Company's management (including the financial and internal audit staff), as well as the independent auditor, have more knowledge and specific information about the Company and its financial statements and performance than do the members of the Committee; consequently, in carrying out its oversight responsibilities the Committee shall not be charged with, and is not providing, any expert or special assurance as to the Company's financial statements or any professional certification as to the independent auditor's work.

153.    In more detail, the Audit Committee Charter provides that the Audit Committee

shall:

(a)    Make regular reports to the Board.

(b)    Review and reassess the adequacy of this charter at least annually and recommend any proposed changes to the Board for approval.

(c)    Prepare the "Committee report" required by the Regulations to be included in the Company's annual proxy statement or in any other reports, statements or other documents the Company files with the SEC.

(d)    Instruct management, the independent auditor and the internal auditor (if any) that the Committee expects to be informed if there are any subjects that require special attention or if any significant deficiencies or material weaknesses to the system of internal control over financial reporting are identified. Review with management and the independent auditor any material changes to the system of internal control over financial reporting.

(e)    Prior to public release, review the Company's annual audited financial statements and any certificate, review, opinion or report of the independent auditor thereon and management's discussion and analysis thereon with management and the independent auditor, together and separately, and discuss with management and the independent auditor significant issues encountered in the course of the audit work, including: major issues regarding accounting and auditing principles and practices; restrictions on the scope of activities; access to required information; the adequacy of internal controls; and the adequacy of the disclosure of off-balance sheet transactions, arrangements, obligations and relationships in reports filed with the SEC.

(f)    Instruct the independent auditor to report to the Committee on all critical accounting policies of the Company, all alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor, and other material written communication between the independent auditor and management, and discuss these matters with the independent auditor and management.

(g)    Review an analysis prepared by management and the independent auditor of significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements.

(h)    To the extent the Company is required to provide in its annual report on

Form 10-K (1) a management's report on internal control over financial reporting ("Management's Report") and/or (2) an independent auditor's audit of the effectiveness of the Company's internal control over financial reporting and its attestation report ("Attestation Report"), review and discuss Management's Report and Attestation Report with management and the independent auditors prior to the filing of the Company's annual report on Form 10-K that contains Management's Report and/or  Attestation Report, as the case may be.

(i)     Review with management and the independent auditor the Company's quarterly financial statements prior to the earlier of the release of quarterly earnings or the filing of the Company's quarterly report on Form 10-Q; provided that this responsibility may be delegated to the chairman of the Committee or a member of the Committee who is determined to be the Committee financial expert.

(j)     Review major changes to the Company's auditing and accounting principles and practices as suggested by the independent auditor, internal auditors (if any) or management.

(k)     Select and retain an independent registered public accounting firm to act as the Company's auditors for the purpose of auditing the Company's financial statements, books, records, accounts and internal controls over financial reporting.

(l)     Ensure the receipt of, and evaluate the written disclosures and the letter that the independent auditor submits to the Committee regarding the auditor's independence consistent with Independent Standards Board Standard 1, discuss such materials with the auditor, oversee the independence of the independent auditor and, if so determined by the Committee in response to such materials, recommend that the Board take or the Committee take appropriate action to address issues raised by such evaluation to satisfy itself of the independence of the auditor.

(m)     Evaluate together with the Board the performance of the independent auditor and, if so determined by the Committee, terminate and replace the independent auditor.

(n)     Approve the fees to be paid to the independent auditor.

(o)     Approve, in accordance with Sections 10A(h) and (i) of the Exchange Act, the Regulations and the Auditing Standards of the Public Company Accounting Oversight Board, all professional services, including  non-audit services, to be provided to the Company or its subsidiaries by its independent auditor, provided that the Committee shall not approve any

non-audit services prescribed by Section 10A(g) of the Exchange Act in the absence of an applicable exemption. The Committee may adopt policies and procedures for the approval of such services which may include delegation of authority to a designated member or members of the Committee to approve such services so long as any such approvals are disclosed to the full Committee at its next scheduled meeting.

(p)     Meet with the independent auditor prior to the audit to review the planning and staffing of the audit.

(q)     Obtain from the independent auditor assurance that no illegal acts that would have a direct and material effect on the determination of financial statement amounts have been discovered in the course of the audit which would implicate Section 10A of the Private Securities Litigation Reform Act of 1995.

(r)     Discuss with the independent auditor the matters required to be discussed by Statement on Auditing Standards No. 61, as amended, relating to the conduct of the audit.

(s)     Review with the independent auditor any problems or difficulties the auditor may have encountered and any management letter provided by the auditor and the Company's response to that letter. Such review should include:

     (i)     Any difficulties encountered in the course of the audit work, including any  restrictions on the scope of activities or access to required information and  any disagreement (and resolution) among management and the  independent auditor in connection with financial reporting, including  preparation of the financial statements;

     (ii)     Any changes required in the planned scope of the internal audit (if an internal audit is contemplated or conducted).

(t)     Following the review described in paragraph (s) above and prior to public  disclosure, if so determined by the Committee, recommend to the Board that the  annual financial statements be included in the Company's annual report on Form  10-K.

(u)     Prior to public disclosure, review and discuss with management all press releases,  including earnings press releases, regarding the Company's financial results and  any other information provided to securities analysts and rating agencies,  including any non-GAAP financial information.

(v)     Approve the hiring of current or former employees of the independent auditor for executive level positions with the Company if those persons are or were involved in the independent auditor's audit of the Company.

(w)     Meet periodically with management to review the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

(x)     Discuss the Company's policies and procedures regarding compliance with applicable laws and regulations with the Board.

(y)     Obtain reports from management, the Company's senior internal auditing executive (if any) and the independent auditor that the Company's subsidiary/foreign affiliated entities are in conformity with applicable legal requirements.

(z)     Review with management and the independent auditor the effect of SEC and other similar regulatory and accounting initiatives as well as off-balance sheet structures on the Company's financial statements.

(aa)    Review with management and the independent auditor any correspondence with SEC or other similar regulators or governmental agencies and any employee complaints or published reports which raise material issues regarding the Company's financial statements or accounting policies.

(bb)    Review with the Company's legal counsel any legal matters that may have a material impact on the financial statements, the Company's compliance policies and any material reports or inquiries received from regulators or governmental agencies.

(cc)    Review with the Company's investment officer the performance of the Company's investment portfolio, and report the investment portfolio results to the Board on a quarterly basis. Periodically establish benchmark yields for various categories of the Company's investments as per the Company's Investment Policy.

(dd)    Review and when appropriate, recommend to the Board any modifications to the Company's Investment Policy.

(ee)    Establish a procedure for receipt, retention and treatment of any complaints received by the Company about its accounting, internal accounting controls or auditing matters and for the confidential and anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

  (ff)  Review and approve all related party transactions.

  (gg)  Satisfy itself that adequate procedures are in place for the review of financial information extracted or derived from the Company's financial statements and periodically assess these procedures.

154. Upon information and belief, the Company maintained an Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on the members of the Audit Committee as those set forth above.

**Duties Pursuant to the Company's Code of Conduct and Ethics**

155. Additionally, the Individual Defendants, as officers and/or directors of LifeVantage, are bound by the Company's Code of Business Conduct and Ethics (the "Code") which, according to the Code, is "intended to provide guidance to persons functioning in managerial or administrative capacities, as well as to all employees and directors." According to the Code: "The standards set forth in this Code are linked closely to our corporate vision, strategies and values. All of our employees and directors must conduct themselves accordingly and seek to avoid even the appearance of improper behavior."

156. Upon information and belief, the Company maintained a version of the Code and the Principles during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Board as those set forth above.

**Control, Access, and Authority**

157. The Individual Defendants, because of their positions of control and authority as directors and/or officers of LifeVantage, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by LifeVantage.

158.    Because of their advisory, executive, managerial, and directorial positions with LifeVantage, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of LifeVantage.

159.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of LifeVantage, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

160.    To discharge their duties, the officers and directors of LifeVantage were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of LifeVantage were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide shareholders and analysts as to the true financial and business prospects of the Company at any given time,

including making accurate statements about the Company's business and financial prospects and internal controls;

(d)     remain informed as to how LifeVantage conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e)     ensure that LifeVantage was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF DUTIES

161.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to LifeVantage and its shareholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of LifeVantage, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of LifeVantage, the absence of good faith on their part, and a reckless disregard for their duties to LifeVantage and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to LifeVantage.

162.    The Individual Defendants each breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

163.   In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Securities Class Action that alleges violations of the federal securities laws.  As a result, LifeVantage has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

164.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

165.   During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

166.   The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties and unjust enrichment; and (b) disguise and misrepresent the Company's actual business and financial prospects.

167.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements.  Because the actions described herein occurred under

the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

168. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the  wrongdoing.

## DAMAGES TO LIFEVANTAGE

169. As a result of the Individual Defendants' wrongful conduct, LifeVantage disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made. The improper statements have devastated  LifeVantage's credibility. LifeVantage has been, and will continue to be, severely damaged and  injured by the Individual Defendants' misconduct.

170. As a direct and proximate result of the Individual Defendants' actions as alleged above, LifeVantage's market capitalization has been substantially damaged, losing hundreds of millions of dollars in value as a result of the conduct described herein.

171. Further, as a direct and proximate result of the Individual Defendants' conduct,  LifeVantage has expended and will continue to expend significant sums of money. Such  expenditures include, but are not limited to:

(a)     $2.5 to $3.0 million in costs to conduct an internal investigation conducted by

the Audit Committee into the alleged wrongdoing and accounting matters;

(b)   costs incurred in investigating and defending LifeVantage and certain officers in the pending Securities Class Action, plus potentially millions of dollars in settlement or to satisfy an adverse judgment;

(c)   costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based at least in part on LifeVantage's artificially- inflated stock price; and

(d)   costs incurred from the loss of the Company's customers' confidence in LifeVantage's products.

172.   Moreover, these actions have irreparably damaged LifeVantage's corporate image and goodwill. For at least the foreseeable future, LifeVantage will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that LifeVantage's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

173.   Plaintiff brings this action derivatively in the right and for the benefit of LifeVantage to redress injuries suffered, and to be suffered, by LifeVantage as a direct result of the Individual Defendants' breaches of fiduciary duties and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. LifeVantage is named as a nominal defendant solely in a derivative capacity.

174.   Plaintiff will adequately and fairly represent the interests of LifeVantage in enforcing and prosecuting its rights.

175.   Plaintiff did not make a pre-suit demand on the Board to pursue this action

because such a demand would have been a futile and wasteful act.

176.    At the time this action was commenced, the Board of LifeVantage consisted of the following six (6) directors: Jensen, Beindorff, Mauro, Metzger, Okumoto, and Toole. A majority of these individuals are not disinterested and independent with respect to the acts and omissions alleged herein. Each of these individuals faces a substantial likelihood of personal liability for their breaches of the duties of trust, loyalty, good faith, candor, oversight, reasonable inquiry, supervision, and due care described herein. Therefore, demand is futile.

**Demand is Futile as to All Director Defendants Because They Acted in Bad Faith By Failing to Adopt and Implement Necessary Internal Controls**

177.    Defendants' bad faith and breach of the duty of loyalty is demonstrated by their utter failure to establish any internal controls capable of providing reasonable assurance of the Company's compliance with applicable laws and regulations relating to its international distributors, even though they knew that improper sales practices and other legal violations were common in the MLM industry. The Board also failed to adopt an executive incentive compensation clawback policy during the Relevant Period. By failing to enact such basic internal controls while actively creating new incentives for distributors to build organizational volume as quickly as possible, Defendants effectively invited the improper sales practices that were later disclosed in the Company's 2016 Annual Report.

178.    There were several public examples of similar improper sales practices at other MLM companies in the past few years that were known to the Director Defendants. For example, in January 2014, it was reported that Nu Skin had been violating Chinese laws prohibiting MLMs in that (a) Nu Skin required the payment of an entry fee to become a direct seller; 2) direct sellers and distributors were encouraged to recruit a "sales team" of downlines; and 3) Nu

Skin-sponsored training videos encouraged the establishment of downlines and the payment of multi-level compensation in Mainland China.[14]

179.    The July 15, 2016 settlement between Herbalife and the FTC further underscored to the Director Defendants the importance of maintaining internal controls capable of providing "robust, verifiable proof that products are reaching good-faith consumers."[15] Such basic internal controls were necessary simply to ensure that a MLM firm didn't devolve into a pyramid scheme, in addition to ensuring that it could keep track of whether its distributors were engaging in improper sales practices in countries where the Company lacked licenses.[16]

180.    The Director Defendants knew that LifeVantage belonged to the Direct Selling Association (the "DSA") and had adopted the DSA Code of Ethics, pursuant to which LifeVantage had an obligation to review its transactions with distributors to avoid pyramid schemes. The DSA Code of Ethics states as follows:

> Pyramid Schemes
>
> For the purpose of this Code, pyramid or endless chain schemes shall be considered consumer transactions actionable under this Code. The Code Administrator shall determine whether such pyramid or endless chain schemes constitute a violation of this Code in accordance with applicable federal, state and/or local law or regulation.
>
> The definition of an "illegal pyramid" is based upon existing standards of law as reflected in *In the matter of Amway*, 93 FTC 618 (1979) and the anti-pyramid

---

[14] *See* Liang Fei, "Shady Sales," *Global Times*, Jan. 21, 2014, http://www.globaltimes.cn/content/838684.shtml.

[15] Roger Parloff, *Herbalife Deal Poses Challenges For The Industry*, Fortune, Jul 19. 2016, http:// fortune.com/2016/07/19/herbalife-deal-challenges-industry/.

[16] Christine Richard, *Are Investors Underestimating The Risks To Herbalife's International Business?*, Seeking Alpha (Dec. 20, 2016), http://seekingalpha.com/article/4031549-investors-underestimating-risks-herbalifes-international-business.

laws of Kentucky, Louisiana, Montana, Oklahoma, and Texas. In accordance with these laws, member companies shall remunerate direct sellers primarily on the basis of sales of products, including services, purchased by any person for actual use or consumption. Such remuneration may include compensation based on sales to individual direct sellers for their own actual use or consumption.[17]

181.    Moreover, Defendant Jensen knew of similar improper sales practices in the MLM industry through his earlier employment.  LifeVantage's website states that Mr. Jensen "co-founded two thriving multi-level marketing companies" before joining LifeVantage.   Thus, Jensen was well aware of the operations and legal risks endemic to multi-level marketing companies.

182.    Before joining LifeVantage, Jensen served as Chief Sales Officer and/or President of the Americas for Jeunesse Global, LLC ("Jeunesse"), a multi-level  marketing company that sells anti-aging creams and health supplements in the United States and  internationally. On January 8, 2016, Jeunesse sued Jensen for allegedly violating the confidentiality and non-solicitation provisions of his employment agreement. During that  lawsuit, in connection with a discovery dispute pertaining to certain of his affirmative defenses, Jensen alleged the following:

> While employed by [Jeunesse], Mr. ***Jensen learned of various business practices and decisions made by some of the highest executives of [Jeunesse], which he believed to be unsavory, unethical, and perhaps even illegal. Such practices and decisions included improper sales activities in certain specific foreign markets and attempting to sell products in foreign markets, including China, without obtaining required legal authorizations to do so.*** Additionally, Mr. Jensen has knowledge regarding [Jeunesse]'s termination of Matthew Nestler, a former high-level distributor for [Jeunesse], and Mr. Jensen has been identified as a witness in pending litigation between [Jeunesse] and Mr. Nestler. ***Prior to leaving his employment with [Jeunesse], Mr. Jensen voiced concerns about or opposition to these practices and decisions, expressing disappointment with [Jeunesse]'s culture of encouraging profitability through any means necessary***.[18]

---

[17] Available at https://www.lvnmedia.com/company/dsa-code-of-ethics/, last visited Feb. 22, 2017.

[18] Obj. to Order Granting Pl.'s Mot. for Protective Order at 3–4, *Jeunesse Global, LLC v.*

183.    Because the Director Defendants knew about similar improper sales practices  at other MLM companies, they knew or recklessly disregarded the fact that (a) there was a real risk that  LifeVantage distributors could also be engaging in similar misconduct; (b) there was a real risk  that the new incentives and bonus pools, particularly the incentives for rapid growth, would only further encourage distributors to engage in these improper sales practices as a potential competitive advantage, *especially in the absence of any incentive compensation clawback policy at LifeVantage*; and (c) the Company had failed to adopt internal controls capable  of preventing or at least detecting such behavior.

184.    Defendant Jensen also often stated that he remained in close contact with the Company's  distributors. For example, during a presentation at the ICR Conference on January 12, 2016, Jensen emphasized that "we have a direct line of contact right with our customers, as well as  with our distributors. So quite often I'm receiving calls directly from customers or from our  distributors. So we have a lot of contact with them." Defendants also frequently interacted regularly with LifeVantage's Field Advisory Board, a group composed of the Company's top distributors. Through these interactions, Defendants gained knowledge of the lack of internal controls governing the Company's relationship with its distributors.

185.    Moreover, Jensen and other executives directly reported to the Board regarding the Company's relationship with its distributors, and thus the Board was made aware by Jensen of problems with the distributors.    As the Company's most recent Proxy admits, "***Our board of directors directly oversees our strategic and business risk, including geographic, product development and regulatory risks, through regular interactions with our management*** and,

*Jensen*, No. 6-16-cv-00162-GAP-DAB (M.D. Fla. Jul. 18, 2016), ECF No. 34.

from time-to-time, input from independent advisors."[19]

186.    Moreover, LifeVantage's Board met 15 times in fiscal year 2016.  Therefore, based on the 15 board meetings they attended, and "regular interactions" they had with management, including Jensen, a fair inference is that the Director Defendants were apprised during the Relevant Period of the lack of internal controls over the Company's international distributors.  Notwithstanding such knowledge, the Board failed to act to remedy the absence of internal controls.  Failure to act in the fact of a known duty constitutes bad faith and a breach of the directors' duty of loyalty, thereby demonstrating futility of demand.

187.    As the 2016 10-K later acknowledged, the high turnover in FY 2015 in the Company's top management and even its independent auditor was likely "a contributing factor to the material weakness in our internal control over financial reporting related to our business policies, practices, monitoring and training governing our international business operations."  This supports an inference that the Director Defendants were aware of how the turnover contributed to the material weakness.

188.    The Company's lack of adequate internal controls over its international distributors persists.  As the Company admitted in its Form 10-Q filed with the SEC on February 8, 2017, the Company has now adopted some internal controls in this area, but such controls remain deficient:  "Our management identified certain design deficiencies in our internal control over financial reporting related to the lack of sufficient controls surrounding our international business policies, practices, monitoring and training as described below. Based on the evaluation of our disclosure controls and procedures as of December 31, 2016, our Chief Executive Officer

---

[19] *See* 2017 Proxy Statement at p. 20.

and Chief Financial Officer concluded that, as a result of a material weakness in our internal control over financial reporting, our disclosure controls and procedures were not effective as of December 31, 2016."

189.    Moreover, the Company's "business policies, practices, monitoring and training governing our international business operations" are all ***core operations*** of the Company. This supports an inference of scienter by all the Director Defendants as to the absence of adequate internal controls related thereto.

**Demand is Futile as to the Audit Committee Defendants**

190.    The Audit Committee Defendants (Okomuto, Beindorff, and Mauro) were responsible for, among other things, reviewing and approving quarterly and annual financial statements and earnings press releases, overseeing LifeVantage's internal controls over financial reporting, and discharging their other duties described herein. Despite these duties, the Audit Committee Defendants knowingly or recklessly reviewed and approved, or failed to exercise due diligence and reasonable care in reviewing and preventing the dissemination of false and/or materially misleading earnings press releases and earnings guidance, and failed in their specific duties to ensure that the Company's internal controls over financial reporting were sufficient and that statements made by the Company regarding its business and financial prospects were accurate.

191.    The Audit Committee Defendants also knowingly failed to cause LifeVantage to adopt an incentive compensation clawback policy. They thus knowingly or recklessly incentivized the Company's executives to pursue significant bonuses through unlawful conduct that would expose the Company to substantial harm, yet which would not require the executives

to return their substantial incentive compensation when caught. Accordingly, the Audit Committee Defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith. Any demand upon the Audit Committee Defendants therefore is futile.

**Demand is Futile as to Defendant Jensen for Additional Reasons**

192.    In addition to the reasons discussed herein as to why demand is futile as to all Director Defendants, demand is futile as to Jensen because Jensen is not an independent director. Jensen also cannot disinterestedly consider a demand to bring suit against himself  because Jensen is a named defendant in the Securities Class Action, which alleges that he made  many of the same misstatements described above in violation of the federal securities laws. Thus, if Jensen were to initiate suit in this action, he would compromise his ability to simultaneously defend himself in the Securities Class Action and would expose himself to liability in this action.  This he will not do.

193.    Demand is futile for the additional reason that Jensen is an employee of the Company who derives substantially all his income from his employment with (and depends for his livelihood on) LifeVantage, making him, as acknowledged by the Company in its most recent Proxy Statement filed on September 11, 2015, not independent. As such, Jensen cannot independently consider any demand to sue himself for breaching his fiduciary duties to LifeVantage because that would expose him to liability and threaten his livelihood.

**Demand is Futile as to All Director Defendants Because the Director Defendants Face a Substantial Likelihood of Liability**

194.    The Director Defendants face a substantial likelihood of liability for their individual misconduct. The Director Defendants were directors throughout the Relevant Period,

and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its financial and business prospects were accurate.

195.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf, and none of them took any steps in a good faith effort to prevent or remedy that situation.

196.    The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. For the reasons that follow, and for reasons detailed elsewhere in this Complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

197.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein, and are therefore not disinterested parties.

198.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

199.    Moreover, the Director Defendants as directors (and, in some cases, also as Audit

Committee members) owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls and/or internal auditing and accounting controls over financial reporting were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence and due care. Instead, they knowingly and/or with reckless disregard reviewed, authorized and/or caused the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices.

200.    Because of their participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, the Director Defendants face a substantial likelihood of liability, making demand upon them futile.

201.    The Director Defendants also wasted corporate assets by paying improper compensation, bonuses, and severance to certain of the Company's executive officers and directors, including incentive compensation to Defendant Jensen. The handsome remunerations paid to wayward fiduciaries who proceeded to breach their fiduciary duties to the Company was improper and unnecessary, and no person of ordinary, sound business judgment would view this exchange of consideration for services rendered as fair or reasonable.

202.    The Director Defendants' making or authorization of false and misleading statements throughout the Relevant Period, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls or internal auditing and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Audit

Committee's duties were being discharged in good faith and with the required diligence, and/or acts of corporate waste and abuse of control constitute breaches of fiduciary duties, for which the Director Defendants face a substantial likelihood of liability. If the Director Defendants were to bring a suit on behalf of LifeVantage to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do. For this reason, demand is futile.

**Demand is Futile as to All Directors for Additional Reasons**

203.    Each of the Director Defendants receives a lavish annual retainer of at least $92,750 purely for being a Board member.[20] This compensation provides a substantial stipend to  these directors, from which each of them personally benefits, depending for his or her livelihood  in substantial part on LifeVantage. Demand on each of the Director Defendants is futile because,  through their course of conduct to date, they have demonstrated their unwillingness to undertake  any action that would threaten the economic benefits they receive as members of LifeVantage's  Board.

204.    If LifeVantage's current officers and directors are protected against personal liability for their breaches of fiduciary duties alleged in this complaint by Directors & Officers Liability Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the shareholders. However, Plaintiff is informed and believes that the D&O Insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by LifeVantage against the Individual Defendants, known as the "insured versus insured

---

[20] These figures represent 2015 compensation and apply to all director defendants except for Defendant Mauro, who was paid total compensation of $98,750.

exclusion."

205.    As a result, if the Director Defendants were to sue themselves or certain of the officers of LifeVantage, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. Therefore, the Director Defendants cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the  Company's D&O Insurance policy.

206.    Under the factual circumstances described herein, the Individual Defendants are  more interested in protecting themselves than they are in protecting LifeVantage by prosecuting  this action.  Therefore, demand on LifeVantage and its Board is futile and is excused.

207.    LifeVantage has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing. Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct. Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

## COUNT I
### Against the Individual Defendants for Breaches of Fiduciary Duties

208.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

209.    The Individual Defendants owed and owe LifeVantage fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe LifeVantage the

highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and  supervision.

210.    The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

211.    The Individual Defendants each knowingly, recklessly, or negligently approved the  issuance  of  false  statements  that  misrepresented  and  failed  to  disclose  material information  concerning  the  Company.  These  actions  could  not  have  been  a  good  faith exercise  of  prudent  business  judgment  to  protect  and  promote  the  Company's  corporate interests.

212.    As  a  direct  and  proximate  result  of  the  Individual  Defendants'  failure  to perform  their  fiduciary  obligations,  LifeVantage  has  sustained  significant  damages.  As  a result  of  the  misconduct  alleged  herein,  the  Individual  Defendants  are  liable  to  the  Company.

213.    Plaintiff, on behalf of LifeVantage, has no adequate remedy at law.

## COUNT II
### Against the Individual Defendants for Unjust Enrichment

214.    Plaintiff  incorporates  by  reference  and  realleges  each  and  every  allegation contained above, as though fully set forth herein.

215.    By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of LifeVantage.

216.    The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to LifeVantage.

217.    Plaintiff,  as  a  shareholder  and  representative  of  LifeVantage,  seeks restitution  from  defendants  and  seeks  an  order  from  this  Court  disgorging  all  profits,

benefits, and other compensation obtained by defendants from their wrongful conduct and fiduciary breaches.

218.    Plaintiff, on behalf of LifeVantage, has no adequate remedy at law.

## COUNT III
### Against the Individual Defendants for Waste of Corporate Assets

219.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

220.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period. It resulted in continuous, connected, and on-going harm to the Company.

221.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) by paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

222.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

223.    Plaintiff, on behalf of LifeVantage, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.      Against all defendants for the amount of damages sustained by the Company as a result of defendants' breaches of fiduciary duties, unjust enrichment, and waste of corporate

assets;

B.     Directing LifeVantage to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect LifeVantage and its shareholders from a repeat of the damaging events described herein, including but not limited to putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation, and taking such other action as may be necessary to place before shareholders for a vote the following corporate governance proposals or policies:

- a proposal to require the Company to adopt a stringent incentive compensation clawback policy;

- a proposal to strengthen the Company's internal reporting and financial disclosure controls;

- a proposal to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a proposal to ensure the accuracy of the qualifications of LifeVantage's directors, executives and other employees;

- a proposal to permit the shareholders of LifeVantage to nominate at least two candidates for election to the Board;

- a proposal to strengthen the Company's procedures for the receipt, retention, and treatment of complaints received by the Company regarding internal controls; and

- a provision to appropriately test and then strengthen the Company's internal operational control functions.

C.     Awarding to LifeVantage restitution from the Individual Defendants, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

D.     Awarding to Plaintiff the costs and disbursements of the action, including

-77-

reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

      E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

      Plaintiff demands a trial by jury.

DATED:  February 27, 2017           Respectfully submitted,

                                     HARPER LAW, PLC

                                     _____s/ Jon V. Harper_____
                                   Jon V. Harper
                                   68 South Main Street, Suite 800
                                   Salt Lake City, UT 84101
                                   Telephone: (801) 910-4357
                                   Email: jharper@jonharperlaw.com

                                   BOTTINI & BOTTINI, INC.
                                   Francis A. Bottini, Jr.
                                   Albert Y. Chang
                                   Yury A. Kolesnikov
                                   7817 Ivanhoe Avenue, Suite 102
                                   La Jolla, CA 92037
                                   Telephone:    (858) 914-2001
                                   Email:        fbottini@bottinilaw.com
                                                  achang@bottinilaw.com
                                                  ykolesnikov@bottinilaw.com

                                   ***Attorneys for Plaintiff***

## **VERIFICATION**

I, Charles Baker, declare as follows:

I have reviewed the Verified Shareholder Derivative Complaint (the "Complaint"). Based upon discussions with and reliance upon my counsel, and as to those facts which I have personal knowledge of, the Complaint is true and correct to the best of my knowledge, information and belief.

I verify under penalty of perjury that the foregoing is true and correct.

Dated:  February 24, 2017                        _____ s/ Charles Baker _____
                                                             Charles Baker